422 So.2d 95 (1982)
STATE of Louisiana
v.
Robert SAWYER.
No. 81-KA-1566.
Supreme Court of Louisiana.
October 18, 1982.
Rehearing Denied November 24, 1982.
*97 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Phillip J. Boudousque, Abbott J. Reeves, William C. Credo, Asst. Dist. Attys., for plaintiff-appellee.
David Katner, George Escher, New Orleans, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of death. The principal issue on review of the guilt phase of the trial is the sufficiency of the evidence of aggravated arson as an essential element of the offense. R.S. 14:30. The principal issues on review of the penalty phase involve (1) admission into evidence of defendant's indictment for second degree murder in an unrelated incident and his subsequent plea to involuntary manslaughter, (2) the sufficiency of the evidence supporting the aggravating circumstances found by the jury, and (3) the prosecutor's closing argument.
Facts
A series of bizarre and frightful events, which led to the death of Fran Arwood, occurred at the residence where defendant was living with Cynthia Shano and Ms. Shano's two young sons. Ms. Arwood was divorced from Ms. Shano's stepbrother, but remained friendly with her and often helped her by taking care of the children. Defendant had lived with Ms. Shano in Texas for several months and had professed an intention to marry her.
On September 28, 1979, Ms. Arwood was staying with Ms. Shano and helping with the children while Ms. Shano's mother was in the hospital. Defendant and Ms. Shano went out for the evening. Defendant returned at about 7:00 o'clock the next morning with Charles Lane, whom defendant had apparently met in a barroom and had invited to the residence for more drinking and talking.[1]
Defendant and Lane continued their drinking while listening to records. At some time during the morning, Ms. Shano left to check on her hospitalized mother. When she returned, she noticed that Ms. Arwood was bleeding from her mouth. Defendant told Ms. Shano that he had struck Ms. Arwood after an argument in which he accused Ms. Arwood of giving some pills to one of the children.
The reasons behind the events that followed are difficult to discern accurately from the record and more difficult to comprehend. However, defendant does not vigorously contest the fact that Ms. Arwood in his presence was beaten, scalded with boiling water and burned with lighter fluid, or that the ferocity of the attack and the severity of the injuries caused her to die several weeks later without ever regaining consciousness.[2]
After the original altercation during Ms. Shano's absence, defendant and Lane, for some unexplained reason, decided that Ms. *98 Arwood needed a bath. When she resisted, defendant struck her in the face with his fist, and both men pummeled her with repeated blows. Ms. Shano objected, but defendant locked the front door and retained the key, threatening to harm Ms. Shano if she interfered or ever revealed the incident.
Acting in concert, defendant and Lane dragged Ms. Arwood by the hair to the bathroom, stripped her naked, and literally kicked her into the bathtub, where she was subjected to dunking, scalding with hot water, and additional beatings with their fists.[3] A final effort by Ms. Arwood to resist the sadistic actions of her tormentors resulted in defendant's kicking her in the chest, causing her head to strike either the tub or an adjacent windowsill with such force as to render her unconscious. Although she did not regain consciousness, defendant and Lane continued to use her body as the object of their brutality.
Defendant and Lane dragged her from the bathroom into the living room, where they dropped her, face down, onto the floor. Defendant then beat her with a belt as she lay on the floor, while Lane kicked her. They then placed her on her back on a sofa bed in the living room. As Ms. Shano went to the bathroom, she overheard defendant say to Lane that he (defendant) would show Lane "just how cruel he (defendant) could be". When she reentered the living room, she was struck by the pungent smell of burning flesh. She then discovered that defendant had poured lighter fluid on Ms. Arwood's body (particularly on her torso and genital area) and had set the lighter fluid afire.[4]
Then, displaying a callous disregard for the helpless (and mortally injured) victim, defendant and Lane continued to lounge about the residence listening to records and discussing the disposition of Ms. Arwood's body. Lane fell asleep next to the beaten and swollen body of the victim.
Shortly after noon, Ms. Shano's sister and nephew came to visit. When the nephew knocked insistently, defendant gave Ms. Shano the key to open the door, and she ran screaming to the safety of her relatives. Her excited ravings ("They've killed Fran and they're trying to kill me") were incomprehensible to her nephew and sister until they looked inside and saw the gruesome scene and Ms. Arwood's beaten and blistered body. They also saw defendant sitting with his feet propped up on the edge of the couch.
In the meantime, Ms. Shano called for police and emergency units. When the authorities arrived, they took Lane and defendant to jail, and rushed Ms. Arwood to a hospital, where she subsequently died.
The grand jury indicted both men for first degree murder. Lane was convicted in a separate trial and sentenced to life imprisonment.[5] Defendant was convicted and sentenced to death.
Review of Guilt Phase
Defendant contends the evidence was insufficient to establish the essential elements of first degree murder.
R.S. 14:30, defining first degree murder, at the time of the offense provided in pertinent part:
"First degree murder is the killing of a human being:
"(1) When the offender has specific intent to kill or to inflict great bodily harm *99 and is engaged in the perpetration or attempted perpetration of ... aggravated arson...;"
Although defendant presented the testimony of laymen and psychiatrists regarding his allegedly intoxicated condition and its effect on his ability to form a specific intent to kill or inflict great bodily harm, the jury reasonably rejected the defense. There was ample evidence from the testimony of the arresting officer and Ms. Shano from which a rational juror could have found that defendant acted with specific intent, despite his excessive consumption of alcohol.
There was also ample evidence from which a rational juror could have concluded beyond a reasonable doubt that defendant was engaged in the perpetration of aggravated arson.[6] His act of igniting a flammable liquid, after pouring it onto the bed sheet (a movable) and the body of a helpless human being, certainly created a foreseeable risk of endangering human life. (This act also evidenced the specific intent to inflict great bodily harm.) The resulting flames set fire to the sheet and produced severe burns on the victim's body.[7] Thus, the evidence was plainly sufficient to support the conviction.[8] See State v. Lane, above; Jackson v. Virginia, 443 U.S. 307, 99 *100 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additional Facts in Penalty Phase
At the sentencing hearing, both the state and defendant offered additional evidence.
Over defense objection, the state called a deputy prosecutor from Arkansas to present documentary evidence establishing the circumstances of defendant's prior indictment for second degree murder in the killing of a four-year-old child and his eventual plea to involuntary manslaughter. The records also revealed that the trial court was presented with the facts of the incident before accepting defendant's plea of guilty to involuntary manslaughter and sentencing him to serve three years in prison.[9] Defendant was released on parole after one year and successfully completed his parole.
Defendant and his older sister both testified about defendant's unhappy childhood. Defendant's mother committed suicide shortly after the birth of defendant and a twin sister, when the older sister was only four years old. The circumstances forced the family to separate, and, according to defendant's sister, his father seemed to blame defendant for the family woes. He was extremely harsh and brutal with defendant.[10] As a child, defendant was faced with long hours of hard work on his father's Tennessee farm. He received few rewards or gratifications for his labors, either in terms of parental words or actions reflecting praise and affection, or in opportunities for traditional childhood activities.
Understandably, defendant began to run away at an early age. He was eventually institutionalized, but ran away from the state mental health facility. He lived with various relatives until he was about 17, when he left to begin a series of riverboat jobs.
Defendant also gave his version of the events leading to his prior conviction for involuntary manslaughter. In response to defendant's professions of accident and of love and affection for the child, the prosecutor cross-examined him about the cause of various injuries on the child's body and about a statement he gave to police admitting that he had whipped the child.
Despite the evidence offered in mitigation, the jury recommended the death penalty, relying on three aggravating circumstances: (1) that defendant was engaged in the commission of aggravated arson, (2) that the offense was committed in an especially cruel, atrocious and heinous manner, and (3) that defendant had previously been convicted of an unrelated murder.
Review of Penalty Phase
Because the jury recommended the death penalty, this court must review the record to determine that the prosecutor and the trial court adhered to the procedural protections outlined by the Legislature and that *101 the sentence is not excessive. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In reviewing a death sentence, we are required by Supreme Court Rule 28 to consider:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Sufficiency of Evidence of Statutory Aggravating Circumstances
C.Cr.P. Art. 905.3 requires that the jury find beyond a reasonable doubt the existence of at least one of the statutory aggravating circumstances listed in C.Cr.P. Art. 905.4 before the jury can even consider recommendation of the death sentence. And Supreme Court Rule 28, § 1(b) requires that this court, on review for excessiveness, determine that the jury's finding was supported by the evidence.
The jury found the existence of three statutory aggravating circumstances. The evidence is clearly sufficient, as discussed earlier, to support the jury's finding with respect to the commission of an aggravated arson. The evidence also supports the jury's finding that the offense was committed in an especially cruel, atrocious and heinous manner.[11]
Defendant argues, however, that every aggravating circumstance found by the jury must be supported by the evidence and that the evidence does not support a finding that defendant was previously convicted of an unrelated murder. See State v. Monroe, 397 So.2d 1258 (La.1981). The last portion of defendant's argument is correct, in that a finding of a conviction for an unrelated murder is not supported by a record which reflects only a conviction for involuntary manslaughter. State v. Culberth, 390 So.2d 847 (La.1980). However, C.Cr.P. Art. 905.3 only requires that the jury find the existence of one aggravating circumstance in order to consider recommending a sentence of death.
This court has upheld death sentences when only one of several aggravating circumstances found by the jury was supported by the evidence (as long as defendant was not unduly prejudiced by failure to comply with procedural safeguards or by the influence of arbitrary factors during the penalty phase, and as long as the death sentence was not otherwise excessive). State v. Martin, 376 So.2d 300 (La. 1979), cert. denied, 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297; State v. Monroe, above.[12] The adequately supported finding of the existence of one aggravating circumstance is alone sufficient to place defendant in that category of offenders properly exposed *102 to the possibility of the death sentence.[13] See Williams v. Maggio, 679 F.2d 381 (5th Cir.1982) (en banc).
Thus, under Louisiana's statutory scheme, the jury at the penalty trial must in effect make two separate but closely related findings in order to recommend a death sentence. The jury must first find the existence of at least one statutory aggravating circumstance as a threshold requirement before even considering imposition of the death penalty. If an aggravating circumstance is found, then the jury must take into account any mitigating circumstances and must make a separate finding regarding whether the death penalty should be imposed, considering both the particular crime and the particular offender. If the jury recommends the death penalty, this court must review each of the two separate jury findings.
Here, the supported finding of the commission of aggravated arson fulfilled the requirement of C.Cr.P. Art. 905.3 and the review requirement of Supreme Court Rule 28, § 1(b) regarding a supported finding of the existence of at least one aggravating circumstance. The effect of a determination by this court that the evidence did not support the finding of an additional aggravating circumstance is a question which is more pertinent to the review of the jury's second findingthat is, the finding regarding the appropriateness of the death penalty for this particular crime and this particular murderer. We will address that question in the context of a discussion (in the next subsection) of whether evidence, which was offered in support of an unproved aggravating circumstance, introduced an arbitrary factor into the penalty phase which misdirected the jury's sentencing discretion. Passion, Prejudice or other Arbitrary Factors
The evidence offered in support of the unproved aggravating circumstance in this case consisted of the official records of the Arkansas circuit court and prison pertaining to defendant's conviction of involuntary manslaughter. Defendant objected to this evidence on the basis (1) that the documents were hearsay and were not properly authenticated and (2) that evidence of the indictment for second degree murder was inadmissible because only evidence of the conviction was admissible.
A review of the record reflects that the documents were properly certified and were also authenticated by the testimony of the deputy prosecuting attorney. They were identified as properly certified copies of original documents, which were official records of the circuit court and of the Arkansas State Prison.[14] We therefore conclude *103 that admission of the records was not barred by the lack of authenticity or by hearsay rules.[15]
Defendant's second ground for objection raises the question of what evidence is admissible in the penalty phase of the trial. C.Cr.P. Art. 905.2 declares that the hearing shall focus on the circumstances of the offense and propensities of the offender, but does not provide any specific rules regarding the admissibility of evidence at this unique type of hearing. At a sentencing hearing in a noncapital case (in which the judge will determine the sentence), many of the usual rules of evidence do not apply, because the postconviction focus on the appropriateness of sentence is vastly different from the preconviction focus on guilt or innocence. See Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), which was cited in Gregg for the proposition that in "the determination of sentences, justice generally requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender". 428 U.S. at 189, 96 S.Ct. at 2932.
The instant case presents the question of whether evidence of a prior unrelated conviction of involuntary manslaughter (which clearly is relevant to a focus on the character and propensities of the offender) is admissible in the prosecution's case in chief, before the defendant takes the stand or otherwise puts his character at issue.[16] In Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950,49 L.Ed.2d 929 (1976), the Court, although not specifically addressing the issue, approved a capital sentencing procedure in which any relevant evidence may be introduced in the penalty phase after the offender has been found guilty under a statute (similar to Louisiana's present statute) which defines first degree murder to require the finding of an enumerated aggravating circumstance as an essential element of the offense.[17] The Court did not discuss the scope of evidence admissible in the penalty phase, but relevance obviously cannot be the sole criteria for determining admissibility. It is logical that the offered proof should also conform to the other applicable rules of evidence and that procedural safeguards for fairness (such as notice) must be considered in determining admissibility.
We will not attempt in this decision to lay down detailed rules for admissibility of evidence in the penalty phase, but will address the issue only insofar as it is necessary to decide this case.
We hold that the evidence of the prior unrelated conviction of involuntary manslaughter was properly admitted, although the conviction did not qualify as an unrelated murder under C.Cr.P. Art. 905.4(c) and although defendant did not take any steps to place his character at *104 issue. In the penalty phase of a capital case, the defendant's character is at issue and indeed is one of the principal issues.[18] In this particular case, the evidence of the prior conviction not only was extremely relevant, but also was competent and highly reliable. Moreover, defendant was apparently prepared to meet the evidence and in fact did so with testimony rebutting or explaining the official record's factual statement which served as the basis for acceptance of the plea. We therefore conclude that the evidence of the conviction was properly admitted and did not constitute an arbitrary factor which improperly influenced the jury's sentencing discretion.
As to the evidence of an initial indictment for second degree murder (in the same incident), there was extensive testimony from both defendant and his sister concerning defendant's version of the incident. Even if the fact of an indictment for a greater offense (than the one to which defendant eventually pleaded) should have been excluded, the gravamen of the evidence was a presentation of the facts of the occurrence, and admission of the indictment was certainly not reversible error.
There is another factor in this case which we have considered, even though there was no contemporaneous objection, because of the possibility of prejudicial influence on the jury's recommendation of death. State v. Willie, 410 So.2d 1019 (La.1982). In the final closing argument, the district attorney alluded briefly to the possibility of pardon. In prior cases (decided after this trial), we have warned against such an argument, and we have ordered new penalty hearings in cases in which we concluded that the particular argument constituted an improper influence on the jury. See State v. Lindsey, 404 So.2d 466 (La.1981), and State v. Willie, above. We have never held, however, that an automatic reversal of the death penalty must follow the mere mention of the fact that R.S. 14:30's prohibition against probation or parole for one under sentence of life imprisonment does not exclude executive pardon. Each case must be decided on its own facts and circumstances.
Here, the cryptic and brief comment came in response to the defense attorney's final plea to the jury to spare defendant's life and to sentence him to the "living death of life imprisonment", which implied that defendant could never be released.[19] Had the prosecutor done more than make a passing responsive comment on the possibility of a pardon, perhaps a reversal would be warranted. However, the prosecutor did not dwell on the speculative prospect of future action by the executive nor suggest to the jury that the speculative possibility of future release is a valid reason for recommending the death sentence. Thus, in the context of the entire argument, the prosecutor's responsive remark neither deflected the jury's attention from the ultimate significance and finality of the penalty recommendation nor misguided the jury's sentencing discretion by the introduction of inappropriate considerations.[20]
*105 We also note that the prosecutor commented on Lane's conviction and sentence to life imprisonment. In response to defense counsel's beyond-the-record comment that Lane was sentenced to life (a fact not previously revealed to the jury) and to the suggestion that defendant should receive the same sentence, the prosecutor retorted by arguing (also beyond the record) that he had handled Lane's case and that there were aggravating circumstances present in defendant's case which were not present in Lane's case.
A strong admonition by the trial court, in which he instructed the jury not to consider the comments of either counsel regarding Lane's case, effectively prevented prejudice. The jury was clearly given the impression that defendant's case must be evaluated on its own merits, without regard to the sentence imposed on his original co-defendant.
Proportionality and Excessiveness of Sentence
Section 1, subsection (c) of Rule 28 requires this court to extend its review beyond the evidence submitted to the jury. We must, in effect, decide whether the jury's recommendation of the death sentence was disproportionate, reviewing both the facts presented to the jury and the other materials submitted to us on review. We must consider the recommendations of juries in similar cases (from the judicial district), as well as the character of the defendant and the nature of his crime.
This is the sixth death sentence recommended by a jury in Jefferson Parish since 1976. It is only the third death sentence from that parish which we have upheld.[21] In one other case of a death sentence, we remanded for further evidentiary determinations.[22] In another, we remanded for a new penalty trial due to procedural flaws in the initial proceedings.[23] In one other case, the death penalty was set aside because of improper closing argument.[24]
As required by our rules, the district attorney has submitted information concerning all first degree murder prosecutions, including a brief description of the offense, the offender, and the disposition. A review of those cases illustrates the adage that no two cases are alike. (A brief description of each is included as part of an unpublished appendix.) In some, offenders, while engaged in robberies or burglaries, killed their victims or others who interrupted the commission of their crimes. In others, offenders killed out of anger at or hatred for the victim. In two cases, women were convicted for their part in schemes to kill their spouses.
The only thing which seems clear from a review of the cases presented to Jefferson Parish jurors is that they appear to recommend death in relatively few cases and only in those of an egregious nature. Certainly this case fits that description. Never before has this court been presented on appeal of a death sentence with such callous indifference to human suffering as was displayed here. After administering a savage beating, defendant sat comfortably listening to records, while his tormented victim lay dying before his eyes. Although defendant attempted to show that Lane was the principal aggressor, the jury obviously credited Ms. Shano's account which placed *106 primary emphasis on defendant's role in Ms. Arwood's excruciatingly painful and lengthy ordeal. The jury obviously believed that he was principally responsible for urging Lane to participate in killing a woman who was virtually a perfect stranger to Lane.
Moreover, the superficial disparity between the sentences imposed on Lane and on defendant quickly disappears when one evaluates the culpability of the two men in this incident, as well as their individual backgrounds. Neither of the two juries, which separately heard the cases and made the recommendations, acted unreasonably. Two participants in the same murder can easily be viewed very differently for penalty purposes.[25]
This murderer, a mature man of almost 30, was not under the domination of any other human being, nor did he play a minor role in the brutal slaying. Furthermore, unlike Lane, he had previously killed a helpless, weaker human being. His case is easily distinguishable from Lane's.
Defendant's only endeavor to present factors in mitigation was his presentation of his own version of the child's death and his heartrending account of a pitiful, deprived childhood. While the factors were properly considered by the jury and must be considered on appeal, they pale into insignificance when faced with the horrendous offense committed against a helpless young woman.
The value which society places on human life has led the Legislature to enact severe penalties for the unjustified killing of a human being. That same concern for the intrinsic worth of the life of the accused has also led courts and legislatures to erect carefully designed procedures which must be scrupulously followed before an accused's life may be taken by the state for his crime.
This court's function in reviewing a death penalty recommendation by a jury is not to sit as a subsequent sentencing panel, but to insure that the jury's recommendation was not influenced by arbitrary factors or improper considerations. The jury in this case was unanimously convinced beyond a reasonable doubt that defendant committed first degree murder and that the circumstances warranted the imposition of the maximum penalty which may be imposed. We are convinced, on review of the record, that the jury's recommendation was not reached arbitrarily and was not based on improper considerations, and we have been shown no basis for overturning that recommendation on appeal.
Accordingly, defendant's conviction and sentence are affirmed.
DIXON, C.J., and DENNIS, J., concur with reasons.
CALOGERO, J., concurs for reasons assigned by DIXON, C.J.
DIXON, Chief Justice (concurring).
I respectfully concur.
C.Cr.P. 905.2 is ambiguous. We should not interpret it to permit the introduction of "character and propensit[y]" evidence except "according to the rules of evidence." C.Cr.P. 905.2. Here, however, the error of permitting evidence of bad character before character is placed at issue by defendant was harmless beyond reasonable doubt.
DENNIS, Justice, concurring in the result.
I concur in the result but strenuously disagree with the majority's unabashed disregard of the law and rules of evidence governing capital sentence hearings.
Code of Criminal Procedure article 905.2 clearly provides that "[t]he hearing shall be conducted according to the rules of evidence" *107 and that "[e]vidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue." This plainly indicates that, except for evidence relative to aggravating and mitigating circumstances, the introduction of character evidence is governed by the rules of evidence, including the statutory rules set forth by R.S. 15:479-83. Of these, R.S. 15:481 and 483 are most pertinent here: § 481 "The state is permitted to introduce testimony of the bad character of the accused only in rebuttal of the evidence introduced by him to show good character." § 483 "No other investigation into the character of a witness is permissible except such as affects his credibility." These rules plainly state that a defendant's character cannot be attacked until he puts it at issue by the introduction of good character evidence or by taking the witness stand. Our law contains also a great many jurisprudential rules, not the least important of which are the rules adopted by this court in State v. Prieur 277 So.2d 126 (La.1973), to guarantee due process of law and relevance in the introduction of other crimes evidence.
The majority is completely wrong in stating that art. 905.2 does not provide any specific rules regarding the admissibility of evidence at a capital sentence hearing. Art. 905.2 clearly states that the hearing shall be conducted according to the "rules of evidence" which obviously include those laws previously enacted by the legislature and probably encompass those rules previously adopted by this court. As any evidence scholar knows, the legislature has not yet enacted a comprehensive evidence code and our body of that law is inadequate and unworkable without the jurisprudentially developed rules.
In truth, the majority has ignored the sentencing procedure enacted by the legislature and is attempting to fashion a procedure more to its liking. Apparently, the majority prefers the procedure that was adopted by Texas as described by the Supreme Court in Jurek v. Texas 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). In a Jurek sentence proceeding, the jury is nearly always asked to make a finding on only one question not already answered at the guilt trial. That is, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." See Black, Capital Punishment, the Inevitability of Caprice and Mistake 115 (2d ed. 1981). When this is the crucial question, perhaps a wide-open-no-holds-barred procedure, allowing any and all bad character evidence from the word go, is appropriate. But the Texas Jurek proceeding is quite different from the procedure established by Louisiana law under which the jury must find beyond a reasonable doubt that at least one statutory aggravating circumstance exists, and weigh against it any mitigating circumstances, before it may go on to unanimously recommend a sentence of death. Regardless of which procedure in our personal opinions is wiser, fairer, or more just, this court has no legitimate power to usurp the plenary will of the Legislature and reshape the statutory system according to its own specifications.
I find it quite disturbing also that the majority seeks to support its disregard of the law and rules of evidence by implying that there is no essential difference between a capital sentencing by a jury and a noncapital sentencing by a judge. Is the majority implying that this court considers the solemn protections with which the legislature earnestly has surrounded the imposition of our most severe penalty to be meaningless technicalities? That "many of the usual rules of evidence do not apply" even though the Legislature has said they must? If so, the majority's cavalier attitude toward the law enacted by the Legislature and the extremity and permanence of capital punishment is appalling.
The majority opinion is very unclear as to what "procedural safeguards ... (such as notice)" will be required in penalty hearings. See p. 103. It is hoped that the majority intends to apply the Prieur guidelines to capital punishment proceedings. It would seem that in the sentencing phase of a capital case most of all, a defendant is *108 entitled to notice, fairness and due process and should not lose his life because of surprise or the lack of a fair opportunity to meet the evidence against him. Yet, the majority has said in footnote 16 that the "usual prohibition" against other crimes evidence is "not applicable in the penalty phase of a capital trial." Its reference on page 103 to the "applicable rules of evidence" is robbed of any meaning by the rest of the opinion which seems dedicated to doing away with rules of evidence in sentencing hearings.
In my opinion, the character of the defendant is not generally at issue ab initio in a capital sentencing hearing. Evidence relevant to an aggravating or mitigating circumstance is admissible throughout the proceeding. Unless it fits within this category, however, bad character evidence, including other crimes evidence, is admissible against the defendant only according to the rules of evidence. The opening sentence of C.Cr.P. art. 905.2, which states that the sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender does not vitiate the meaning of the great number of detailed provisions which follow it. "Focus," when used as a verb means to concentrate or to converge. The introductory statement that the hearing shall concentrate on the defendant's character among other matters is not equivalent to saying that all character evidence shall be admissible. The remaining provisions of Art. 905.2 et seq. tell exactly how the hearing shall focus or concentrate on its subjects, and basically that is by following the rules of evidence, except that the introduction of all evidence relevant to aggravating or mitigating circumstances is permitted.
Additionally, I do not consider myself bound by any of the footnotes in the majority opinion. Footnotes numbers 12 and 13 particularly appear to be entirely unnecessary and seem to reach out to decide issues not before us. The statement that the finding of guilt "automatically" constitutes a finding of an aggravating circumstance in the penalty hearing is contrary to law. The jury must independently find at least one aggravating circumstance during the sentence hearing before it may consider the death penalty. C.Cr.P. art. 905.3. The elliptic statements regarding Zant v. Stephens, ___ U.S. ___, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), and its possible relationship to our law are unclear, unwise, and unnecessary. Footnote Number 16 is an outright perversion of the law. It flatly states that the prohibition against other crimes evidence is not applicable in a penalty phase. Again, C.Cr.P. art. 905.2 clearly indicates to the contrary. It says that evidence relative to aggravating and mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue, which clearly indicates that outside this exception, the state cannot introduce such evidence until the defendant places his character or credibility at issue "according to the rules of evidence." Id.
Nonetheless, I concur in the result. I agree with the Chief Justice that the errors in introducing the bad character evidence were harmless beyond a reasonable doubt. I also concur only in the result for the additional reasons that I find the conviction of guilt to be supportable on a different basis than the majority and consider that another error in the penalty phase was also harmless error.
The first degree murder conviction is justified by the evidence which in my opinion proves that the defendant was a principal to the perpetration of aggravated rape during the criminal transaction.
The death penalty is warranted because the offense was committed in an especially heinous, atrocious, or cruel manner. Although I am uncertain that the evidence supports a finding that the offender was engaged in the perpetration of aggravated arson, and I am troubled by the jury's failure to find the perpetration or attempted perpetration of aggravated rape as an aggravating circumstance, I ultimately conclude that any error committed by the jury during the penalty hearing was harmless. This crime was so horrible and involved such pitiless and needless torture of the *109 victim that I am convinced beyond a reasonable doubt that the jury would have recommended the death penalty even if it had been informed that the evidence was insufficient to justify findings that the offender was engaged in the perpetration of aggravated arson or had previously been convicted of an unrelated murder.
I agree with the majority's statement at p. 106 of its opinion that this court does not sit as a subsequent sentencing panel. But a word of caution is necessary. By this, we do not mean that we have abandoned our constitutional function of reviewing death sentences to see if they constitute cruel, unusual or excessive punishment under the circumstances of the case. What is meant is that we do not formulate or impose sentences; we either affirm them or reverse them.
LEMMON, Justice, concurring in denial of rehearing.
On application for rehearing, defendant contends that the admission of evidence of nonstatutory aggravating circumstances violated his constitutional right by injecting arbitrary factors into the jury's exercise of sentencing discretion.
Evidence of defendant's prior conviction of involuntary manslaughter, although not constituting proof of a prior conviction of an unrelated murder, was admissible to prove the statutory aggravating circumstance that defendant had a substantial past history of criminal activity. C.Cr.P. 905.4(c). Competent evidence of a criminal conviction is clearly admissible in this regard, and such evidence is highly relevant to the central focus of the sentencing hearing on the character and propensities of the offender. C.Cr.P. Art. 905.2.
Moreover, C.Cr.P. Art. 905.2's provision that the sentencing hearing "shall be conducted according to the rules of evidence" obviously refers to the applicable rules of evidence. While R.S. 15:481 and 483 would have been applicable to exclude evidence of defendant's character in the guilt phase of the trial, those statutes are simply not applicable rules of evidence in the sentencing phase. The purpose of R.S. 15:481 and 483 is to insure that a conviction is based on the accused's guilt, rather than on his bad character. But once guilt has been validly determined, the purpose of those statutes has been served, and the statutes should not be applied to exclude competent evidence of bad character, when the focus of the hearing itself puts the defendant's character at issue. C.Cr.P. Art. 905.2. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, above.
NOTES
[1] Whether Ms. Shano stayed out all night with defendant or returned home earlier during the evening was the subject of conflicting testimony. That dispute, however, is not critical to the resolution of any significant factual or legal issue in the case.
[2] One of the doctors described the cause of her death as "metabolic exhaustion" resulting from severe blows to her head and incredibly severe (third degree) burns over more than one-third of her body.
[3] She was probably also forced to engage in sexual intercourse with Lane during a brief period when Lane was left to guard her while defendant was boiling water in the kitchen to scald her. Although the record does not necessarily support an inference that she was raped at that point in time, this is not fatal to either the conviction or the sentence, as will be discussed later.
[4] Ms. Shano testified that Lane told her his sex organ had been burned when defendant ignited the lighter fluid while he was having intercourse with the (unconscious) victim. She further testified that defendant then told Lane "Nobody told you to stay inside of her while I told you I would show you how hot pussy can get".

There were also burn marks on the new sheets on the sofa bed as a result of the incident, and defendant's fingerprints were found on a can of lighter fluid.
[5] His conviction was affirmed by this court. See State v. Lane, 414 So.2d 1223 (La.1982).
[6] R.S. 14:51 defines aggravated arson as follows:

"Aggravated arson is the intentional damaging by any explosive substance or the setting fire to any structure, watercraft, or movable whereby it is foreseeable that human life might be endangered."
[7] We need not decide in this case whether merely setting fire to a flammable liquid, after pouring it over the body of an unconscious human being, constitutes aggravated arson. In this case the element of setting fire to a movable was satisfied by the burning of the bed sheet (as proved by the photographs of the sheet showing holes with charred edges, rather than mere scorching or blackening as defendant argues). We also note that in Lane this court referred, in another context, to the burning of the sheet as satisfying that essential element of the offense, as follows:

"The record reflects testimony of lighter fluid being poured on the victim and on surrounding sheets and sofa bed. The victim was then set on fire, as was the bedding around her. Lighter fluid is an explosive substance. There is no doubt that these acts were intentional and it was surely foreseeable that Frances Arwood's life would be endangered by such acts. The trial judge reasoned that the fabric around the victim and the sofa bed could certainly be considered movables within the meaning of the statute. In our opinion, the trial judge was correct in charging the jury as to the definition of aggravated arson." 414 So.2d at 1228.
The setting fire to a flammable liquid, after placing the liquid in close proximity to a human body, obviously creates the foreseeable risk of great harm. Arguably, such an act constitutes aggravated arson under R.S. 14:51, because of the setting fire to the flammable liquid, which is a movable, even if no other movable is burned.
Under statutes defining arson in terms of the burning of dwellings (at common law, arson was an offense against habitation), it was logical for courts to reason that the mere setting fire to "kindling" for the purpose of burning a house was not arson, unless the house itself was burned. See R. Perkins, Criminal Law, Ch. 3, § 2B and C (2d ed. 1969). However, when a statute (such as R.S. 14:51) is extremely broad with respect to the nature of the "thing" set afire, and the statute's focus is primarily on the creation of foreseeable risk of great harm to humans, the igniting of "kindling" or lighter fluid for the purpose of engulfing a human body (or part of a human body) in flames might sufficeas long as the endangerment element is satisfied.
Nevertheless, as stated above, resolution of that question is not required here, because defendant did set fire to bedclothes by pouring lighter fluid and igniting it, and that act endangered the victim's life.
[8] The evidence was sufficient to support the conviction because of the jury's supported finding as to the commission of the offense of aggravated arson, and it is unnecessary to determine whether the evidence also established beyond a reasonable doubt that defendant was a principal to the offense of aggravated rape. Significantly, the jury found (in enumerating the aggravating circumstances after the penalty hearing) that defendant was engaged at the time of the killing in the commission of an aggravated arson (and not of an aggravated rape).

There was no error, however, in the trial judge's instructing the jury regarding the elements of aggravated rape. The evidence justified an instruction on the essential elements of the offense, and the jury was capable of drawing reasonable inferences from the evidence based on the trial court's instructions.
Finally, the prosecutor's mention in closing argument (without contemporaneous objection) that there were two rapes, one of which was proved by the fact that Lane was alone in the bathroom with the victim for 10 to 20 minutes, was certainly not sufficiently prejudicial to warrant a reversal of the conviction.
[9] According to the facts contained in the record, the young victim, who was the daughter of a woman with whom defendant was living, had been left in defendant's care while her mother went to work. Defendant brought the child to the emergency room of the hospital to be treated for injuries, which eventually resulted in her death. The medical evidence indicated that the child received a severe blow to the head. Further examination revealed bruises, scars and burn marks suggesting that the little girl had been the victim of earlier physical abuse.

The Arkansas prosecutor eventually accepted defendant's plea that the killing was committed "without malice" and without an intent to "produce death". See Section 41-2209, Arkansas Criminal Code. Defendant claimed that he was trying to discipline the child (who was allegedly "playing in her food") when the child's highchair fell over, causing her to hit her head on the concrete floor.
[10] One incident related by defendant's older sister described the frustration he faced as a child. His grandfather had given defendant a calf to raise. His father persuaded defendant to let him sell the calf to raise funds for the farming operation, agreeing to allow defendant to participate in a ball game in town. When the day of the eagerly awaited game arrived, the father refused to drive the boy to town, and defendant, then a preteen child, walked and hitchhiked the eight miles to the town. Upon his return, his father brutally beat him for acting contrary to his wishes.
[11] This court has construed this provision to include only those homicides in which the victim was subjected to "serious physical abuse... before death". State v. Sonnier, 402 So.2d 650, at 659 (La.1981). Thus, only in those cases in which the offender tortured or pitilessly inflicted unnecessary pain on the victim has this court held that this aggravating circumstances was supported by the evidence. See State v. Baldwin, 388 So.2d 664 (La.1980). See also State v. Culberth, 390 So.2d 847 (La.1980). The record in this case overwhelmingly supports such a finding.
[12] At the time of this offense (although not at the time of the crime in the Martin and Monroe decisions), R.S. 14:30 required, as an essential element of first degree murder, the existence of at least one of four enumerated aggravating circumstances, which were also among the statutory aggravating circumstances listed in C.Cr.P. Art. 905.4. Therefore, under the present law the class of murderers for which the death penalty is potentially available has already been narrowed by the additional elements now necessary for a conviction of first degree murder, and a supported verdict of guilty of first degree murder in the guilt phase of the trial automatically fulfills the threshold requirement of a finding of at least one statutory aggravating circumstances, thereby authorizing the jury to consider imposing the death penalty. The penalty phase now serves primarily to afford an opportunity for the prosecution to offer proof of additional aggravating circumstances and for the defense to offer proof of mitigating circumstances.
[13] In Zant v. Stephens, ___ U.S. ___, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), the United States Supreme Court (after the death sentence was reversed by a three-judge panel of the Fifth Circuit) remanded to the Supreme Court of Georgia for certification of the question of the state law premises that support the validity of the death sentence when one of the statutory aggravating circumstances found by the jury was constitutionally invalid. The present case, unlike Stephens, does not involve a facially unconstitutional aggravating circumstance. Moreover, C.Cr.P. Art. 905.3 is the state law basis in Louisiana for the jury's consideration of imposition of the death penalty when only one statutory aggravating circumstance found by the jury is supported by the evidence.

Finally, the use of statutory aggravating circumstances, which was approved in Gregg v. Georgia, above, as a method of channeling the jury's discretion in the determination of which first degree murderers are "death eligible", is particularly important in a capital sentencing scheme in which any intentional murder may be a capital offense. Unlike the Georgia statutory scheme (in which proof of a statutory aggravating circumstance in the penalty phase is a crucial consideration in the jury's determination of which first degree murderers should be punished by death), Louisiana's present capital sentencing procedure requires (as noted in Footnote 12) the finding of an aggravating circumstance in the guilt phase of the trial, and the class of murders for which the death penalty will even be considered by a jury has already been significantly narrowed by the Legislature as a method of guiding sentencing discretion. Under the present law, many first degree murders in Georgia would be second degree murders in Louisiana.
[14] As this court said in State v. Nicholas, 359 So.2d 965 (La.1978):

"Generally, if an official writing is proved to come from the proper office where such documents are kept, the document will be authenticated as genuine by the certification of the custodian because of the presumption that he will carry out his duty to receive, record and certify only genuine official papers and reports." 359 So.2d at 969; see also 7 J. Wigmore, Treatise on Evidence §§ 2158-2159 (3d ed. revision 1940); McCormick, Law of Evidence § 224 (2d ed. 1972).
See also R.S. 15:457 and R.S. 15:529.1.
[15] Compare State v. English, 367 So.2d 815 (La.1979), in which this court reversed a death sentence because the state failed properly to authenticate certain documents offered at the penalty trial.
[16] The usual prohibition against a jury's hearing evidence of other crimes, when such evidence tends merely to show a defendant's bad character, is not applicable in the penalty phase of a capital trial, because (unlike the guilt phase) the inquiry is designed to focus on defendant's character.
[17] In Jurek, the court noted:

"While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose. * * So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing optioneven potentiallyfor a smaller class of murders in Texas. Otherwise the statutes are similar. Each requires the sentencing authority to focus on the particularized nature of the crime."
[18] The prosecution arguably should be allowed to affirmatively negate the mitigating circumstances that defendant "has no significant prior history of criminal activity". C.Cr.P. Art. 905.5(a). If the prosecutor cannot introduce evidence of prior convictions in the case in chief during the penalty hearing, and the defendant introduces no character evidence, then the jury might be misled into believing that the existence of the mitigating circumstances has been proved by the absence of evidence.

Although the penalty hearing is to be conducted according to the applicable rules of evidence, the usual prohibition against the prosecution's initiation of the inquiry into defendant's character is simply not applicable in the penalty phase, where the focus on character is one of the statutory means of channeling the jury's sentencing discretion.
[19] The only reference in closing argument to the possibility of pardon was:

"The statute speaks without benefit of probation, suspension, commutation of sentence. The statute does speak about a pardon. The statute doesn't speak about a commutation so don't think that if you vote for first degree murder, I'm sorry, for life imprisonment that that will be the end of this matter as it related to Robert Sawyer because it's not."
[20] Prosecutors tread on dangerous ground by mentioning the availability of pardon. Even though such a remark is accurate, it has little relevance to the penalty determination, except to give the jury a complete picture of the overall scheme for punishing first degree murderers (and perhaps to correct inaccurate defense statements or implications that a murderer under sentence of life imprisonment can never be released from prison).
[21] In State v. Berry, 391 So.2d 406 (La.1980), we affirmed a recommended death sentence in a Jefferson Parish case in which the murderer intentionally killed a deputy sheriff during an aborted bank robbery. And in State v. Johnny Taylor, 442 So.2d 109 (La.1982), decided this day, we affirmed the death sentence in a case in which the murderer lured the victim from his home at night on the pretext of buying the victim's used automobile, stabbed the victim 20 times, and locked him alive in the trunk of the car, where he was left to die.
[22] See State v. Smith, 400 So.2d 587 (La.1981).
[23] See State v. Lindsey, 404 So.2d 466 (La. 1981).
[24] State v. Jimmy Robinson, 421 So.2d 229 (La.1982).
[25] See, for example, the cases involving the two Sonnier brothers, in which they kidnapped and murdered a young couple after raping the girl. This court eventually affirmed the death sentence for the older brother, who had a serious criminal record. See State v. Sonnier, 402 So.2d 650 (La.1981). However, this court concluded death was excessive for the younger brother, who acted under the influence and domination of his older brother and whose role in their crime was "relatively minor". See State v. Sonnier, 380 So.2d 1 (La.1979).