455 So.2d 659 (1984)
STATE of Louisiana
v.
Jimmy L. GLASS.
No. 83-KA-1735.
Supreme Court of Louisiana.
May 14, 1984.
Rehearing Denied September 14, 1984.
*660 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Dist. Atty., for plaintiff-appellee.
Glenn F. Armstrong, Maurice Loridans, Bossier City, for defendant-appellant.
CALOGERO, Justice.
Defendant, Jimmy Glass, was indicted by a Webster Parish Grand Jury on two counts of first degree murder. Because of pretrial publicity, venue was changed from the Twenty-Sixth Judicial District to the Fifteenth Judicial District in Lafayette. Glass was found guilty as charged and the jury recommended the death penalty.[1] In this appeal defendant argues fifteen assignments of error.
In this opinion we will treat the four assignments of error (assignments 5, 10-11, and 9), which are potentially the most serious, and review the sentence. The remaining assignments involve legal issues governed by clearly established principles of law. They will be treated in an appendix which will not be published, but which will comprise part of the record in this case.
Because we find none of defendant's assignments of error meritorious, defendant's conviction and death sentence will be affirmed.

FACTS
The facts as adduced at trial are as follows. Defendant Glass, who was in prison following his conviction and sentence for armed robbery, and one Jimmy Wingo, who was awaiting trial on two counts of burglary, escaped from the Webster Parish Jail in Minden, Louisiana, on Christmas Eve, December 24, 1982. Around eight o'clock that evening, the two men were being allowed to make telephone calls to their families. When the deputy had to leave them unattended momentarily, because of a disturbance in the cells, they descended in the elevator and escaped.
What happened at the crime scene comes largely from the trial testimony of the defendant. According to Glass the escape was Wingo's idea. Once outside, the two men made their way from Minden to Dixie Inn, Louisiana, for the most part walking through fields. Defendant testified that they came out on a road and found some kind of business and a house (with no one evidently at home). As they tried to enter a window at the back of the house, a car turned into the driveway. According to Glass' testimony the duo watched Mr. and Mrs. Brown get out of the car and go into the house. Since the keys were not left in the parked car, Wingo decided to check out the storeroom located in the carport area. He found a refrigerator containing beer.[2] *661 They retreated beyond the hedge and drank beer. According to Glass' testimony Wingo decided that they should wait until the couple went to sleep, smash the patio door, then go in, surprise the couple, and tie them up. During the planning and drinking, Glass also consumed some champagne.
The defendant testified that, pursuant to Wingo's instructions, he cut the telephone wires with a pair of hedge clippers and threw a piece of petrified wood through the glass of the patio door. Glass and Wingo then opened the door, entered the house and ran down the hall to the bedroom where they found Mrs. Brown standing on the side of the bed screaming and Mr. Brown lying in the bed. Mr. and Mrs. Brown were told to lie face down on the bed. By that time Wingo had acquired a shotgun and rifle. Defendant Glass rooted through the man's billfold and through various furniture drawers, etc. In the nightstand drawer Glass found .38 caliber shells. He asked Mr. Brown where the pistol was kept and was told that it was in the closet. He went to the closet where he found the gun. While searching for the gun Glass cut his thumb on a saw that was on the closet shelf.[3] Mrs. Brown told defendant Glass the location of her purse which he then emptied in the living room. As defendant looked through other rooms for possible loot, he called out Wingo's name and asked him what to do next. Wingo told Glass to shut up. After taking liquor from the kitchen cabinet and putting it in the back seat of the Browns' car, defendant was allegedly told by Wingo that he, Glass, had to kill the couple, who had been bound and gagged, since Glass had called out Wingo's name when they were in the house.
Defendant testified that Wingo poked him in the back of the head with the shotgun barrel and told him that he was to kill them, or Wingo would "splatter [his] brains all across this room."[4] Glass testified that Wingo kept the shotgun at defendant's neck or back as Glass made his way back to the bedroom. Then Glass allegedly put his knee on the foot of the bed, more on the man's side, bent over, closed his eyes and pulled the trigger.[5] As the woman raised her head and started to scream, defendant allegedly pointed the gun, closed his eyes, and pulled the trigger.[6] Glass testified that, before leaving the room, he pulled the covers up over the victims' heads.
Wingo and Glass then took the Browns' car[7] toward Vivian, Louisiana, so that Wingo could see his girlfriend. In Vivian, the two men were forced to abandon the car which had broken down after hitting high water which had flooded the road. The pair walked to the house of Wingo's sister and picked up Gwen Hill, Wingo's girlfriend, and spent a day in the woods. Glass testified that the three then took a truck and drove to Atlanta, Texas, where Wingo and Gwen stayed in a motel room, while defendant took the truck and went on to Little Rock, Arkansas, and eventually to a friend's house. In the meantime, state troopers began looking for Glass. He then allegedly took a bus to Ventura Beach, California. From there he went to San Diego where he was eventually picked up.

ASSIGNMENT OF ERROR NO. 5
Defendant Glass contends that the trial judge erred when he refused to appoint *662 another psychiatrist to examine defendant after one of two psychiatrists who had been appointed failed to examine defendant with respect to his sanity at the time of the offense.
Prior to trial defendant was allowed to change his "not guilty" plea to a plea of "not guilty and not guilty by reason of insanity." At the time defendant requested that he be allowed to withdraw his original plea, he also requested a continuance of the trial date. Defendant, an indigent, requested this continuance hoping that he would be able to obtain a psychiatric examination by physicians of his own choice at the expense of the Indigent Defender Board. The trial court refused to grant a continuance but gave defendant the opportunity to request the appointment of a Sanity Commission. Defendant took advantage of the opportunity. The court appointed Dr. Robert L. Turner and Dr. James H. Blackburn to examine defendant in order to assess his mental condition at the time of the offense.
Dr. Blackburn examined defendant and submitted a psychiatric evaluation in which he found that defendant was not suffering from any mental illness or emotional disorder which would have affected him severely at the time of the offense. He recited also that defendant was able to assist in his own defense. Defendant did not object to the sufficiency of Dr. Blackburn's report.
Defendant did object to the one sentence report of Dr. Turner which read: "I have examined Jimmy Glass and find him to be competent, capable of understanding the charges against him with an understanding of the difference between `right' and `wrong', and capable of assisting counsel in his defense."
In objecting to Dr. Turner's report defendant argued that it did not discuss the issue of sanity at the time of the offense. In response to his objection, the trial judge allowed defendant to subpoena Dr. Turner in order to cross-examine him, out of the presence of the jury, with respect to defendant's sanity at the time of the offense.
At the hearing Dr. Turner elaborated on his brief written report. Dr. Turner testiifed that he conducted a psychiatric interview with defendant in which he questioned defendant about such things as his thought content, intellectual functioning, past history, sensorium, mood, and his state of mind at the time of the offense. It was Dr. Turner's opinion that defendant has an antisocial personality disorder. However, he was of the view that defendant was not suffering from any type of mental disease or defect which would have prevented him from knowing the difference between right and wrong.
A fair reading of the testimony of Dr. Turner, coupled with his brief report, including its reference to defendant's knowing the difference between right and wrong, the appropriate test for time of offense insanity under La.R.S. 14:14, leads us to conclude that the doctor did examine for and testify to defendant's sanity at the time of the offense. Under these circumstances, it was not error for the trial judge to refuse to appoint another doctor.[8]
Having determined that the sanity commission appointed by the trial court fulfilled its duties, we find that this assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 10 AND 11
With these assignments of error defendant contends that the trial court erred when it charged the jury that the defense of coercion is not available to one charged *663 with the murder of an innocent person. Defendant also argues that the trial judge erred when it refused to charge the jury, in accordance with defendant's requested special jury charges nos. 7 and 9, that the jury "must analyze defendant's personal intent based upon the `mental element proved at trial' and `may not attribute to him any such specific intent which may have existed on the part of another person.'"[9]
The trial judge's instruction to the jury, that the defense of coercion is not available to one charged with the murder of an innocent person,[10] was based upon La.R.S. 14:18 which provides in part:
The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
(6) When any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the threat is present and would immediately carry out the threats if the crime was not committed. (emphasis provided)
Defendant takes the position that he was compelled to kill the victims when Wingo held the gun to his head and ordered him to kill the couple. In brief defendant argues that "while it may not be an affirmative defense which excuses otherwise criminal conduct, coercion has a defensive role in determining the degree of the offense and the culpability of the offender in a murder case." Defendant contends in brief that "the killing of a human being while under the compulsion of an imminent and imperative threat of death ... negates the requirement of proof of specific intent in a prosecution for first degree murder."
We find that this assertion by defendant does not comport with the law. While coercion, or threats by Glass' accomplice (which we will accept as true for purpose of this argument), may in large part have affected Glass' motivation, i.e., to save his own life, this factor has no bearing on whether defendant had specific intent as required by the first degree murder statute.[11]
Under the facts of this case the jury might properly conclude that by shooting both victims with the barrel of the pistol in contact with their heads defendant had the specific intent to kill them. It is apparent that he "actively desired" to end their lives, regardless of the fact that his principal motivation may have been to save his own life.
*664 The pertinent concern is not whether coercion eliminates the requirement for proof of specific intent, but whether coercion, under these circumstances should, by law, be seen as justifiable, and constitute a defense. The legislature has provided a negative response by its enactment of La. R.S. 14:18(6), supra.[12]
The trial judge's instruction to the effect that the defense of coercion is not available to one charged with murder is a correct statement of the law. La.R.S. 14:18(6); State v. Capaci, 179 La. 462, 154 So. 419 (1934).[13]
We find that the trial court was also correct in refusing to charge the jury in accordance with defendant's requested special charges nos. 7 and 9. See n. 2 supra.
A defendant has the right to submit special written charges to the jury. The trial judge must give a requested charge which does not require qualification, limitation or explanation and which is not included in the general charge or another special charge, if it is correct and pertinent to the case. La. C.Cr.P. art. 807; State v. Shilling, 440 So.2d 110 (La.1983); State v. James, 431 So.2d 399 (La.1983); State v. Lovett, 359 So.2d 163 (La.1978).
Defendant's requested charge which stated that defendant had to have "personally desired the deaths" of the two victims was substantially covered in the trial court's general charge on first-degree murder. In that charge the court stated that specific intent was required and then defined specific intent as the "state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act...." (emphasis in original). Since the requested charge was substantially included in the court's general charge it was properly refused. See State v. Holmes, 388 So.2d 722, 725 (La.1980).
Defendant's requested charge no. 7 pertaining to one who aids or abets in the commission of a crime, was not pertinent under the facts of this case as related by defendant. Defendant did not simply "aid and abet," rather, he was the actual perpetrator of the murders. Thus, this charge was properly refused.
Assignments of Error nos. 10 and 11 are without merit.

ASSIGNMENT OF ERROR NO. 9
With this assignment of error defendant contends that the trial court erred *665 when it refused to permit defendant to exhibit Jimmy Wingo, without compelling him to testify, so that the jury could assess the reasonableness of defendant's fear that Wingo would kill him if defendant did not kill the victims. Specifically, defendant contends that this ruling resulted in a denial of his right to compulsory process of favorable evidence.
During the course of trial the defense requested that it be allowed to call Jimmy Wingo into the courtroom and have him exhibited before the jury as physical evidence. Defense counsel informed the court that the purpose of using Wingo as physical evidence was to corroborate defendant's anticipated testimony concerning the fact that defendant was afraid of Wingo. Thus, exhibiting Wingo before the jury presumably would have supported defendant's argument concerning coercion.
The state did not object to defendant's request to exhibit Wingo as physical evidence. However, at the time this request was made Wingo, against whom murder charges were then pending, had his defense attorneys present in the courtroom. Wingo's lawyers asserted their objection to any viewing or presentation of Wingo. Their objection was based on the belief that exhibiting Wingo during defendant's trial, and the attendant publicity, would ultimately prejudice Wingo's right to a fair trial. The attorneys also expressed their belief that bringing Wingo into the courtroom might cause venue problems in his own case.
The trial court refused to grant defendant's request and cited as authority State v. Berry, 324 So.2d 822 (La.1975). Defense counsel then requested a subpoena duces tecum to produce mug shots of Wingo for the purpose of showing the jury what Wingo looked like. The trial court refused this request, again citing State v. Berry, supra, and stating that the defense was trying to make an impression on the jury which would prejudice the jury members.
The trial judge then suggested that Wingo could be weighed and measured and that there might be a stipulation as to this information. In the alternative he suggested that witnesses, or the defendant himself, could testify to Wingo's size.
On appeal defendant correctly contends that State v. Berry, supra, cited by the trial court as authority, is not determinative of the present issue.[14] Nonetheless, we note that the trial judge later elaborated on his refusal to allow defendant to display Wingo as physical evidence. The trial judge correctly understood that the purpose of exhibiting Wingo was to support defendant's coercion argument: namely, that defendant was physically afraid of Wingo and was compelled to kill the victims because of that fear. The court concluded that since coercion is not a defense to murder (see discussion under Assignments of Error nos. 10 and 11), such evidence was not relevant in the guilt phase of the first degree murder trial. The court did suggest that using Wingo as an exhibit to support defendant's coercion argument might be relevant during the sentencing phase in order to prove a mitigating circumstance. Apparently, the judge was referring to La.C.Cr.P. art. 905.5, which provides, as a mitigating circumstance in capital sentencing, that "[t]he offense was committed while the offender was under the influence or under the domination of another person."
Interestingly, during the sentencing phase of the trial defense counsel did not seek to have Wingo shown to the jury as evidence of a possible mitigating circumstance, or for any other reasons.
*666 Defendant did testify that he was forced to kill the victims, and during closing arguments defense counsel did mention that one of the mitigating circumstances is the fact that the offense was committed while the offender was under the influence or domination of another person. In addition, the trial judge included that mitigating circumstance in his instructions to the jury. It is of course likely that the jury did not believe defendant's testimony that Wingo forced him to shoot the victims.
Defendant's claim of coercion, if believed, would not have justified the two murders. La.R.S. 14:18(6). Nor would his argument have affected the determination of whether defendant had the requisite specific intent. Accordingly, we find that the trial court did not err in its refusal to grant defendant's requests to exhibit Wingo and show his mug shots to the jury.
This assignment of error is without merit.

SENTENCE REVIEW
On April 8, 1983, the jury found defendant, Jimmy Glass, guilty of the first degree murders of Newton and Erlene Brown. Following the sentencing phase, on April 9, 1983, a unanimous jury recommended that defendant be sentenced to death. La.C. Cr.P. art. 905.1. Pursuant to the jury recommendation, on April 29, 1983, the trial court sentenced defendant to death. La.C. Cr.P. art. 905.8.
La.C.Cr.P. art. 905.9.1 mandates that this Court review every sentence of death for excessiveness. In particular, this Court must consider: (a) whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factors; (b) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (c) whether the sentence is disproportionate to the sentences imposed in similar cases considering both the crime and the defendant.
The Capital Sentence Investigation Report reveals that defendant, a white male, was nineteen years old at the time of the crime. He is divorced from his wife and has one child, a daughter, approximately one and one half years old. He has no other dependents and at the time of the offense he was not contributing to the support of his child. He was the first of four children born of a legitimate union. His father was an alcoholic and epileptic who did not provide for the family. Defendant dropped out of high school two weeks prior to finishing twelfth grade. He was failing at least one course needed for graduation. Defendant admits to the use of alcohol and marijuana since the age of thirteen. He admits to using all drugs at some time, including heroin. Glass has never maintained stable and gainful employment. He states that he survives by scamming and stealing. In 1981, defendant enlisted in the Navy. However, he deserted that same year.
The victims were a fifty-five year old white male and a fifty-three year old white female. They were not related to defendant.
As a juvenile, defendant was arrested for arson and burglary and placed on probation until he was eighteen years of age. His adult record is as follows:

 PRIOR RECORD
OFFENSE DATE SENTENCE
1. S/Theft & Crim. Damage to 10/14/80 NP.
 Property
2. Possession of Marijuana 3/3/81 275 F & C or 60 days
3. Armed Robbery 1/5/82 10 years, H.L., without
 benefit of probation, parole,
 or suspension of sentence.
4. Escape 12/24/82 No disposition.

*667
5. Aggravated escape, 1/6/83 Released on Fugitive
 Aggravated burglary, Warrant to Louisiana
 Armed Robbery, Auto Theft State Police in
 and First Degree Murder Webster's Parish
 [present offense] Sheriff's Office

Additionally, Glass remains a fugitive from the U.S. Navy.

PASSION, PREJUDICE AND ARBITRARY FACTORS
Defendant contends that the district attorney brought before the jury the subject of the possibility of a pardon or a commutation by the governor, which is prohibited and thus requires reversal. During the penalty phase of the proceedings, defense counsel called Ms. Nancy Goodwin, a former director of the Louisiana Coalition of Jails and Prisons, to the stand to testify. Counsel asked her:
Q. Ms. Goodwin, do you know of any lifers, persons who are serving life sentences for murder, who have been pardoned?
Ms. Goodwin answered in the negative. Defense counsel tendered and the district attorney cross-examined Ms. Goodwin:
Q. But ... you do know people who got life prison sentences who have been released from jail, don't you?
A. Not while I've been working in, in this State.... I have not found since 1978, when I started doing my work, a person who was sentenced to life for first degree murder who got a commutation or a pardon and is now free. Maybe it happened, but I didn't know anybody. I've known a number of people who got turned down.
Q.... has any one of [the people on death row] been executed? And it simply calls for a "yes" or "no" answer, Ms. Goodwin. Has any single one of those people been executed?
A. No, they haven't.
On redirect examination, defense counsel asked:
Q. The final decision then, Ms. Goodwin, on whether or not a sentence is commutated is left up to someone else, isn't it?
A. Yes. It rests, first of all, with the Pardon Boardthe Pardon Board has to recommend peopleand finally, it is with the governor to say "yes" or "no."
Defendant argues that the district attorney's examination of Ms. Goodwin was aimed at conveying to the jury that defendant could end up back on the streets if he received a sentence of life imprisonment as a result of a pardon by the governor. The district attorney also allegedly attempted to insinuate that the possibility of pardon depended upon whether the governor would be Treen or Edwards [the former and present governors of the State of Louisiana]. Defense counsel did not object that the questions were improper references to pardons during the questioning by the district attorney in order to preserve the issue for review under La.C.Cr.P. art. 841. However, this Court has recognized an exception in capital cases since the court has an obligation to review the record regardless, to determine whether the remarks injected arbitrariness into the proceedings. State v. Copeland, 419 So.2d 899 at 910 (La. 1982).
It is settled that the conditions under which a person sentenced to life imprisonment without benefit of probation, parole or suspension of sentence can be released in the future are not a proper consideration for a capital sentencing jury and should not be discussed in the jury's presence. State v. Copeland, supra; State v. Lindsey, 404 So.2d 466 (La.1981) cert. denied, ___ U.S. ___, 104 S.Ct. 261, 78 L.Ed.2d 246 reh. denied, ___ U.S. ___, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983). "The interjection of pardon and commutation issues provokes questions that no human mind can answer and in substance transposes the task of the *668 governor to the jury." State v. Willie, 410 So.2d 1019 at 1034 (La.1982). In Willie, 410 So.2d at 1033, this Court summarized the settled case law on point:
Further, in reviewing a capital case in which an offender's potential for future release has been injected into the proceedings by the state or the trial court, this Court must presume that a death sentence was imposed under the influence of an arbitrary factor unless the record clearly indicates that the jury was properly informed of its duty and admonished to disregard the improper remarks, and the record indicates that the jury heeded the admonition. State v. Lindsey, 404 So.2d 466 (La.1981); See also, State ex rel. Williams v. Blackburn, 396 So.2d 1249 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981); State v. Sonnier, 379 So.2d 1336, 1364 (La.1979) (Dennis, J., concurring in part); State v. Sonnier, supra at 1368 (on rehearing).
Under the post-Lindsey opinions rendered by this Court, only in State v. Sawyer, 422 So.2d 95 (La.1982), U.S. cert. granted and case remanded, ___ U.S. ___, 103 S.Ct. 3567, 77 L.Ed.2d 1407 (1983), affm'd., State v. Sawyer, 442 So.2d 1136 (La.1983), No. 81-KA-1566 (on remand from the U.S. Supreme Court), did this Court not find reversible error when the district attorney mentioned the possibility of pardon. The Sawyer opinion declared at 422 So.2d 104:
We have never held, however, that an automatic reversal of the death penalty must follow the mere mention of the fact that R.S. 14:30's prohibition against probation or parole for one under sentence of life imprisonment does not exclude executive pardon. Each case must be decided on its own facts and circumstances.
In Sawyer, this Court concluded that the cryptic and brief comment by the district attorney made in response to defense counsel's plea to sentence defendant to "the living death of life imprisonment" did not warrant reversal. The district attorney's comment, as it appears at 422 So.2d 104, n. 19, was as follows:
The statute speaks without benefit of probation, suspension, commutation of sentence. The statute does not speak about a pardon. The statute doesn't speak about a commutation so don't think that if you vote for first degree murder, I'm sorry, for life imprisonment that that will be the end of this matter as it related to Robert Sawyer because it's not.
This Court assessed the remarks as a "passing responsive comment" and noted that the prosecutor did not dwell on the speculative prospect of future action by the governor. This Court concluded at 422 So.2d 104:
Thus, in the context of the entire argument, the prosecutor's responsive remark neither deflected the jury's attention from the ultimate significance and finality of the penalty recommendation nor misguided the jury's sentencing discretion by the introduction of inappropriate considerations. [Footnote omitted.]
Unlike many of the cases on point, in the instant case the possibly problematic references to pardons did not occur in the state's closing argument.[15] The remarks *669 relating to pardon came during cross-examination by the state of the defense witness. In response to questioning, the witness declared that she knew of no such pardons since 1978.
Defense counsel here asked the first question relating to pardons. Thus, it is clear that the defense opened the door on the subject. Moreover, counsel further pursued the topic, on redirect examination. Defense counsel did not ask the court to caution the jurors. The trial court did not admonish the jury members that it was their duty to disregard such considerations.
The information given to the jury members concerning pardon certainly fell far short of the damaging comments made by the state in Lindsey and in Willie. Ms. Goodwin continued to testify that she personally knew of no pardons obtained for offenders convicted of first degree murder since 1978. We do not find that an arbitrary factor was injected through this line of questioning.
In his memorandum, defense counsel also contends that the district attorney sought to evoke the passion of the jury when he argued concerning defendant's prior armed robbery conviction. The defendant had walked "into a convenience store to a little girl who doesn't know him and has nothing to do with trying to earn a living, pulls a knife on her and they rob the store." Defense counsel correctly notes that the PSI report states that the age of the victim in that prior armed robbery of a Midway Handy Stop was forty-one years. Although the state's representation might have been erroneous, it did not create a situation in which passion had been injected into the proceedings.[16]

STATUTORY AGGRAVATING CIRCUMSTANCES
The jury in the instant case found four statutory aggravating circumstances:
(1) the offender was engaged in the perpetration of aggravated burglary [La.C.Cr.P. art. 905.4(a)]; (2) the offender knowingly created risk of death to more than one person [La.C.Cr.P. art. 905.4(d)]; (3) the offense was committed in an especially heinous, atrocious and cruel manner [La.C. Cr.P. art. 905.4(g)]; (4) the offender at the time of the offense was imprisoned after sentence for commission of an unrelated forcible felony [La.C.Cr.P. art. 905.4(f)]. The state contends that all four aggravating circumstances found by the jury clearly existed. The defense argues that the district attorney improperly argued that "just about all of the aggravating circumstances," existed in the case, while in actuality aggravating circumstances number two and four did not exist.
Defendant unpersuasively argues that La.C.Cr.P. art. 905.4(d) was not applicable under the factual circumstances in the instant case since two counts of murder were involved. This Court has held that La.C. Cr.P. art. 905.4(d) is established when the defendant by a single and consecutive course of conduct contemplates and causes a great risk to more than one person. State v. Sonnier, 402 So.2d 650 at 658 (La.1981) (after remand), cert. denied, ___ U.S. ___, 103 S.Ct. 3571, 77 L.Ed.2d 1412 reh. denied, ___ U.S. ___, 104 S.Ct. 36, 77 L.Ed.2d 1455 (1983); State v. Monroe, 397 So.2d 1258 at 1274 (La.1981), cert. denied, ___ U.S. ___, 103 S.Ct. 3571, 77 L.Ed.2d 1411 reh. denied, ___ U.S. ___, 104 S.Ct. 36, 77 L.Ed.2d 1455 (1983). In State v. Sonnier, supra, this Court declared that the execution of two victims lying side by side with six rifle shots clearly amounted to a single consecutive course of conduct by which defendant contemplated a great risk to more than one person. In the instant case, the two victims, with their hands and *670 feet tied, were lying side by side face down on their bed when defendant fired one shot into the head of each. This aggravating circumstance was therefore established.
Defense counsel also argues that La.C. Cr.P. art. 905.4(f) was inapplicable since defendant was not imprisoned when the crime occurred, six hours after defendant escaped from jail and six miles away from the prison, and that the crime was not committed in an atrocious or cruel manner. La.C.Cr.P. art. 905.4(g) Even if the defendant were right, it would not affect the outcome since there are two aggravating circumstances found by the jury which are supported by the evidence. State v. Celestine, 443 So.2d 1091 at 1097 (La.1983). Consequently we pretermit discussion of these latter two arguments.
This Court has upheld death sentences when only one of several aggravating circumstances found by the jury was supported by the evidence (as long as defendant was not unduly prejudiced by failure to comply with procedural safeguards or by the influence of arbitrary factors during the penalty phase, and as long as the death penalty was not otherwise excessive). State v. Martin, 376 So.2d 300 (La. 1979) cert. denied, 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297; State v. Monroe, 397 So.2d 1258 (La.1981) cert. denied ___ U.S. ___, 103 S.Ct. 3571, 77 L.Ed.2d 1411 reh. denied, ___ U.S. ___, 104 S.Ct. 36, 77 L.Ed.2d 1455 (1983).
In the instant case there is ample evidence that defendant was engaged in the perpetration of an aggravated burglary, and that he knowingly created risk of death to more than one person. Clearly two of the four aggravating circumstances are supported by the evidence.

PROPORTIONALITY OF SENTENCE
The final treatment in the sentence review in a capital case is a determination of whether the sentence in the instant case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Supreme Court Rule 28 § 1(c); State v. Narcisse, 426 So.2d 118 at 138 (La.1983). An inference of arbitrariness arises when the sentence is inconsistent with sentences imposed in similar cases in the same jurisdiction. State v. Knighton, 436 So.2d 1141 at 1160 (La.1983).
The sentence review memorandum by the state incorrectly lists the first degree murder prosecutions in the Twenty-Sixth Judicial District, the original venue of this case. Pursuant to the Supreme Court rule, the memorandum should have listed the first degree murder prosecutions in the Fifteenth Judicial District, the district in which the sentence was imposed. There are eleven first degree murder prosecutions in the Fifteenth Judicial District, ten other than the instant case.
State v. Aucoin, 362 So.2d 503 (La.1978), involved the prosecution of a mother for the murder of her eight year old daughter. The killing was done by strangulation, stabbing, beating, and ultimately, by driving a car over the child. The defense claimed mental disease and drug addiction, showing that defendant had been released from Central Louisiana State Hospital just a year before the homicide. She was found guilty of first degree murder and the jury recommended life imprisonment without benefit of pardon, parole or suspension of sentence. Her conviction and sentence were affirmed by this Court.
State v. Thibeaux, 366 So.2d 1314 (La. 1978), involved the prosecution of a thirty-nine year old mother of four for the shooting death of her husband. At trial defendant claimed self-defense. The state offered no aggravating circumstances. She was found guilty of first degree murder; the jury recommended life imprisonment. On appeal, this Court reversed, finding error in the trial court's restriction on the amount of evidence it allowed in, concerning past acts of violence by the victim towards defendant. According to the state's brief, defendant has not been retried.
State v. Francis, 403 So.2d 680 (La. 1981), involved the prosecution of a man who pulled a gun and began shooting after he saw a former girlfriend dancing with *671 another man. A security guard and the dancing partner were killed; the woman was injured seriously. The state sought the death penalty claiming that defendant had knowingly created a risk of death or great bodily harm to more than one person. Defendant was found guilty of two counts of first degree murder. The jury recommended life imprisonment. This Court affirmed.
State v. Narcisse, 426 So.2d 118 (La. 1983), involved the prosecution of defendant for the stabbing death of his seventy-four year old great-aunt during an armed robbery. Several of the wounds could have independently caused the victim's death; she had been beaten, had broken a hip in a fall during the struggle and had suffered several broken ribs. The state urged two aggravating circumstances: that the murder was committed during an armed robbery and that the crime was done in an especially heinous, atrocious or cruel manner. Defendant was found guilty of first degree murder. On appeal this Court found a sufficiency of evidence to support one of the aggravating circumstances and upheld both conviction and the recommended sentence of death. According to the state's Sentence Review Memorandum, this was the first death penalty handed down by a Lafayette Parish jury in approximately fifty years.
State v. Thibodeaux, 383 So.2d 1264 (La. 1980), involved the shooting death of a man who had been playing pool. The defendant shook off the restraining arms of friends and fired four times at the victim. The jury convicted him of first degree murder and returned with a verdict of life imprisonment. This Court affirmed.
State v. Watson, 449 So.2d 1321, has recently been affirmed by this Court. Willie Watson's trial ended in his conviction for the first degree murder of a medical student during the commission of a kidnapping, aggravated rape and armed robbery. On appeal, this court affirmed the conviction but vacated the death penalty because the trial court had erroneously instructed the jury that, upon finding of one aggravating circumstance, a recommendation of death must be returned. State v. Watson, 423 So.2d 1130 (La.1983). On remand, the case was assigned to Vermilion Parish for a new penalty phase hearing. That jury also recommended death for defendant.
State v. John F. Fuller, No. 83-KA-0619, is presently on appeal to this Court. Defendant had been convicted for the shooting death of his mother-in-law during an armed robbery. Defendant confessed, turned in the gun and also admitted that he had burglarized the victim's home on a prior occasion. The state argued two aggravating circumstances: the murder occurred during an armed robbery and the crime was an especially heinous, atrocious or cruel one. The jury recommended the death penalty.
State v. Willie Celestine, 443 So.2d 1091 (La.1983), involves the rape and murder of an elderly woman. Celestine broke into her home, severely beat the woman and raped her as well. The state relied upon several aggravating circumstances: (1) the commission of an aggravated rape; (2) the heinous and atrocious manner in which the murder was committed; (3) the fact that defendant had been previously convicted of two independent charges of aggravated rape. Following the recommendation of the jury, the judge sentenced defendant to death. The conviction and sentence have been affirmed by this Court.
State v. Summit, No. 83-KA-0293, is presently on appeal to this Court. Defendant, armed with a knife, killed a fifty-five year old man in a public bathroom along an interstate highway. When the victim resisted, Summit stabbed him three times and then fled. At his arrest, Summit admitted he intended to rob the man, but was thwarted when the victim fought back. The state sought the death penalty, arguing one aggravating circumstance, that the murder had been committed during an attempted armed robbery. Defendant, in mitigation, argued the lack of prior significant record (i.e., no felony convictions). Finding the aggravating circumstance *672 urged by the state, the jury convicted and recommended the death penalty.
State v. Jimmy Wingo, No. 84-KA-0260, is currently on appeal to this Court. Jimmy Wingo, of course, is defendant Glass' accomplice in the perpetration of the very murder which we here review. Not only did this jury recommend death for Glass in connection with the murder of Mr. and Mrs. Brown, but also a different jury who tried Jimmy Wingo after Glass obtained a severance also recommended death for the accomplice Wingo.
The Aucoin, Thibeaux, Francis and Thibodeaux juries recommended life imprisonment. Those cases in which no death sentence was recommended involved situations where there was some type of mitigating evidence offered. In State v. Aucoin, mental disease was involved. State v. Thibeaux was a domestic dispute. The situation in State v. Francis involved barroom jealousy; State v. Thibodeaux was also a barroom argument. The four remaining cases resulted in the imposition of the death penalty. Fuller, Narcisse, Wingo and Celestine all involved murders perpetrated upon elderly victims in their homes. Distinguishable from the four cases in which the death penalty was not recommended, these cases involved cold-blooded murder with no clear mitigating circumstances involved.
In the instant case, these two murders were also cold-blooded. Mr. and Mrs. Brown, in their fifties, were evidently executed in order that they could not identify the armed men who had broken into their home in the dead of night on Christmas Eve, 1982. Defendant pulled the trigger. Although defense counsel argues that defendant was coerced into killing the couple, that claim was established only by defendant's testimony. The record does not establish that Glass' death sentence was disproportionate when it is viewed in light of sentences for similar offenses.

Decree
Accordingly, for the reasons assigned, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.

On Application for Rehearing
PER CURIAM.
As noted in our original opinion the sentence review memorandum by the state incorrectly listed the first degree murder prosecutions in the Twenty-Sixth Judicial District, the original venue of the case. Pursuant to our rule, the memorandum should have noted the first degree murder prosecutions in the Fifteenth Judicial District, the district in which the case was tried and the sentence imposed.
Defendant in his application for rehearing claimed that this Court's review of Fifteenth Judicial District Court capital prosecutions, following a state sentence review memorandum which did not address those prosecutions deprived him of a meaningful opportunity to address proportionality as related to the appropriate other capital cases.
Responding to that complaint and pending consideration of relator's rehearing application we directed the state to file an appropriate supplemental sentence review memorandum and invited a defense response. Those documents have now been filed.
Relator's application for rehearing is without merit and is herewith denied.
NOTES
[1] Glass' companion, Jimmy Wingo, was also indicted on two counts of first degree murder. After Glass' motion to sever was granted, Wingo was also tried, found guilty of first degree murder and sentenced to death. His case is presently pending in this Court on appeal, No. 84-KA-0260.
[2] According to defendant, Wingo also found gloves in the storeroom which he wore from that time on.
[3] Defendant's fingerprints were found on the saw.
[4] There is only defendant's testimony to the effect that he was forced to kill the two victims.
[5] Dr. George McCormick, the pathologist, testified that both victims died as a result of a laceration of the brain due to a single gunshot wound. The bullet entered Mr. Brown's head on the right side of the back of the head and exited on the left side of the forehead. The bullet entered Mrs. Brown's body and exited above the right eyebrow. Both were contact wounds, according to the pathologist.
[6] The pathologist testified in rebuttal that it would have been impossible for defendant to be so positioned when he shot the couple. The doctor had originally testified that the killer had most probably been positioned in the bed between the two victims.
[7] Defendant Glass' fingerprints were found on the Browns' Lincoln Continental when it was recovered.
[8] Having changed his plea to not guilty and not guilty by reason of insanity, and having had psychiatric evaluations performed by two doctors, defense counsel was at liberty to call the doctors to the stand, in the presence of the jury, and have them testify about defendant's sanity at the time of the offense. Defendant chose not to have the doctors testify. It seems apparent to us that sanity at the time of the offense was never really at issue in the case and defendant did not seriously urge the defense. Nonetheless, the case went to the jury with the issue of insanity before it. The jury determined that the sanity defense did not prevail and defendant was guilty as charged.
[9] The special instructions requested by defendant read as follows:

DEFENDANT'S REQUESTED SPECIAL JURY CHARGE NO. 7
You are instructed that:
One who aids and abets in the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending upon the mental element proved at trial. STATE V. McALLISTER, 366 So.2d 1340 (La.1978).
DEFENDANT'S REQUESTED SPECIAL JURY CHARGE NO. 9
You are instructed that:
In order to convict this defendant of first degree murder, you must find beyond a reasonable doubt that he personally desired the deaths of Newton Brown and Erlene Brown, or that great bodily harm occur to Newton Brown and Erlene Brown. If you do not find beyond a reasonable doubt that this defendant had such specific intent you must acquit him of first degree murder, and you may not attribute to him any such specific intent which may have existed on the part of another person.
[10] The disputed charge given by the trial judge read as follows:

SPECIAL CHARGE
The defendant's conduct in a murder case is not justified when the offense charged was committed through the compulsion of threats by another of death or great bodily harm and the defendant reasonably believed the person making the threat would carry out the threat. The defense of coercion is not available to one charged with murder of an innocent person. (emphasis in original)
[11] La.R.S. 14:30, which defines first degree murder, includes as an essential element "specific intent to kill or to inflict great bodily harm ..."

Specific intent is defined by La.R.S. 14:10(1):
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
[12] At common law it was generally said that duress does not justify the killing of an innocent person even if the offender acted under imminent threats. State v. Toscano, 74 N.J. 421, 378 A.2d 755 (1977), citing Arp v. State, 97 Ala. 5, 12 So. 301 (1893); Brewer v. State, 72 Ark. 145, 78 S.W. 773 (1904); State v. Nargashian, 26 R.I. 299, 58 A. 953 (1904); People v. Martin, 13 Cal.App. 96, 108 P. 1034 (1910); Taylor v. State, 158 Miss. 505, 130 So. 502 (1930).

The Model Penal Code draftsmen have noted that most of the states which have enacted statutes concerning the defense of duress do not recognize the defense with respect to the most serious crimes. Model Penal Code, § 2.09, Comment 1, at 2 (Tent. Draft No. 10, 1960). However, the draftsmen of the Model Penal Code thought that homicide might sometimes be the "product of coercion that is truly irresistible" and thus did not make murder an exception in their proposed section on duress. Id. Comment 2, at 8. Model Penal Code § 2.09, concerning duress as a defense provides in part:
(1) It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
(2) The defense provided by this Section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.
A few states, while not allowing duress as a complete defense to murder, do permit it to mitigate the killing to manslaughter if the accused was coerced by someone other than his co-conspirator. e.g., Minn.Stat.Ann. § 609.20; Wis.Stat.Ann. § 939.46.
[13] Note, however, in our discussion under Assignment of Error No. 9, infra, that the trial judge was willing to consider allowing this argument during the sentencing phase of the trial.
[14] Berry involved defendants calling a witness to the stand in order to invoke his Fifth Amendment privilege in the presence of the jury. In Berry, the state had the jury removed before the witness took the stand. The witness then took the stand and invoked his privilege. Defense counsel objected to the exclusion of the jury. This Court stated that it was "improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege for the purpose of impressing upon the jury the fact of the claim of privilege." 324 So.2d at 830. That was not the situation in the instant case. Defendant only sought to use Wingo's body as an exhibit.
[15] In brief, defense counsel also points to later statements by the district attorney in closing argument:

Why the death penalty? Because that's the best way. It's no guarantee, no guarantee at all, but it's the best way to stop him from doing it again. As I say, there is no guarantee but it is the best sentence we can put on him to stop it from happening again. He was already in jail for a forcible felony when this happened...
The district attorney later stated:
You have to do this very difficult thing, and I know it's difficult for you-all because I know it's difficult for me. Just like you-all, I have family, too... but it's something we have to do because we have families. Because we know friends and neighbors...
In brief defendant argues that "potential future remedies and possible threat to the families of the prosecutor and jury are prohibited subjects for a capital sentence jury to hear from the prosecution..." We disagree with defendant's assessment of these comments. When read in context, the statements did not concern either the possibility of pardon or possible threats to the families of the prosecutor and jury.
[16] Defendant also alleges that the district attorney sought to prejudice the jury by referring to photographic exhibits not introduced to indicate that the defendant had tattoos. However, defendant's citation to the penalty phase of the transcript is incorrect and the district attorney in his answer to the defense memorandum states that the incident occurred during the guilt phase. Regardless, such a reference to tattoos would not inject arbitrariness.