490 So.2d 255 (1986)
STATE of Louisiana
v.
Dobie Gillis WILLIAMS.
No. 85-KA-1686.
Supreme Court of Louisiana.
May 20, 1986.
Concurring Opinion June 2, 1986.
Rehearing Denied June 30, 1986.
*256 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Don Burkett, Dist. Atty., Elizabeth Pickett, Asst. Dist. Atty., for appellee.
Michael Bonnette, Brett Brunson, for appellant.
BLANCHE, Justice.
Dobie Gillis Williams was indicted by a Sabine Parish Grand Jury of first degree murder in violation of R.S. 14:30. A Motion for a Change of Venue filed by the defendant was granted which resulted in the transfer of the case to the 35th Judicial District Court in Grant Parish. After a four day trial the jury returned a verdict of *257 guilty as charged. At the sentencing phase of the trial, the jury unanimously recommended the death penalty upon finding the existence of two aggravating circumstances. The two aggravating circumstances found by the jury were: (1) "the offender was engaged in the perpetration of aggravated burglary or the attempted perpetration of aggravated rape," and (2) "the offense was committed in an especially heinous, atrocious or cruel manner."
Defendant assigns twenty-four assignments of error; only six of which have been briefed. In a capital case we review all assignments of error. State v. Celestine, 443 So.2d 1091 (La.1983); State v. Narcisse, 426 So.2d 118 (La.1983). Our review also extends to an examination of the record in search for errors patent. In this opinion we will treat eleven assignments of error (assignments 2, 3, 4, 5, 15, 16, 17, 18, 19, 22, and 24) and review the sentence. The defendant's remaining assignments involve legal issues governed by established principles of law and will be treated in an unpublished appendix to this opinion which will comprise part of the official record in this case.

FACTS
On the evening of July 7, 1984, Sonja Knippers was brutally murdered in her Many, Louisiana home. After finishing supper that evening Sonja retired to the sofa in her living room and began watching television. Her husband Charles had retired to the bedroom and had gone to sleep. Around 12:30 a.m. that same night the defendant stacked two milk crates outside the bathroom window, cut the screen, and entered the Knippers' home. At or about the same time Sonja awoke from her sleep and proceeded to the bathroom. After pulling down her underwear to sit on the toilet, she saw the defendant with his pants off standing behind the bathroom door. After she began to scream the defendant locked the bathroom door and began stabbing Sonja with a knife while she was sitting on the toilet.
Charles Knippers was awakened by what he described as the "awfullest bunch of bumping and knocking and banging and screaming and hollering" coming from the bathroom of his home. After hearing his wife exclaim, "This black man is killing me, help me," Charles unsuccessfully attempted to break down the bathroom door. When Sonja finally opened the door, Charles observed blood "pouring down her [entire right side] and just puddling on the floor." He also found the bathroom window open and was told by Sonja that her assailant "went through the bathroom window." Moments after being assisted to the living room couch, Sonja bled to death.
Shortly thereafter officers of the Many City Police and the Sabine Parish Sheriff's Department converged on the Knippers' home. In the course of their investigation they found the bathroom wall and curtains smeared with blood. They also found the bathroom window open. On the brick ledge of the window blood, hairs, and darkly pigmented skin were discovered.
"As the crow flies," only 2000 feet separated the residence where the defendant was staying from the Knippers residence. A wooded area containing trails lies between the two homes. The defendant had been seen approximately one hour prior to the murder, "about 11:30 p.m.," walking away from the A.G. Williams residence, which was the home of his grandfather.
At the time of the murder the defendant was on a five day furlough from Camp Beauregard where he was imprisoned after being convicted of attempted simple burglary. Detectives Jimmy Kinney and Joe Byles, being aware of the defendant's criminal record, proceeded to the home of A.G. Williams to pick the defendant up for questioning. Mr. Williams invited the detectives in and then proceeded to awaken the defendant, who was sleeping on the living room couch. After being advised that he was wanted for questioning the defendant voluntarily accompanied the detectives to the sheriff's office.
Upon his arrival at the sheriff's office, the defendant was advised of the subject of *258 the investigation, advised of his rights, and signed a waiver of rights form. He was then asked to remove his clothing in order for the officers to observe whether there were scratches and abrasions on his body that would be consistent with the type of wounds probably sustained by the person who had dived out of the Knippers' bathroom window.
After removing his shirt the detectives and Dr. C.E. Poinboef observed a puncture wound between Dobie's thumb and forefinger and a fresh scratch on the upper portion of his left arm. When asked to remove his pants, the defendant initially refused. However, after Detective Kinney advised Dobie that he would not be released until he complied with their request, he promptly did so. Detective Kinney and Dr. Poinboef, the coroner, then observed numerous deep abrasions on defendant's thighs and shins. At the trial, Dr. Poinboef expressed the opinion that these injuries had been sustained within two or three hours of the examination. After further interrogation the defendant finally admitted that he had murdered Sonja Knippers.
In confessing to the murder he explained how he entered the Knippers' home through the bathroom window. Once in the house he walked down the hall leading to the living room; after reaching a certain point and seeing Sonja stretched out on the living room couch, he retreated to the bathroom. When defendant heard Sonja walking down the hall towards the bathroom, he hid behind the bathroom door. After entering the bathroom, she pulled down her underwear, and sat down on the toilet. It was then that she saw the defendant behind the door and began screaming. Defendant immediately closed and locked the bathroom door. Defendant then began to repeatedly stab the victim.[1] Defendant then jumped out of the bathroom window, dropped the knife in the Knippers' yard and ran to his grandfather's house where he hid his shirt underneath the porch. Although no written confession was obtained, an unsuccessful attempt was made to record the statement mechanically. At trial detective McComic, Byles, and Kinney testified as to the content of the defendant's confession.
After defendant made his statement, the investigators returned to the Knippers' home where they found a kitchen knife in four inches of damp grass. The officers later retrieved the shirt from the place where the defendant stated it was hidden.
On the day after the homicide blood, saliva, and various hair samples were taken from the defendant at the North Louisiana Crime Laboratory in Shreveport. Laura Johnson, a forensic serologist, conducted various tests on these samples. She determined that a sample of blood retrieved from the bathroom window curtain was of a type entirely consistent with the defendant's. The expert also stated that only two out of every one hundred thousand blacks share this type of blood. Furthermore, the sample found on the curtain was inconsistent with the blood types of Charles and Sonja Knippers.
Laura Johnson also compared the hair samples taken from the defendant to strands of hair recovered from the window ledge of the bathroom window. Two strands of hair were recovered from the window ledge. One was a negroid pubic hair and the other was a leg hair. Laura Johnson testified that when compared to the samples taken from the defendant, the characteristics were consistent.
Dr. George McCormick, a forensic pathologist, examined the defendant and the remains of Sonja Knippers. When he examined the defendant he found scrapes and abrasions on his thighs and shins. He also found abrasions on the triceps of the left arm and on the outer surface of the left arm. Dr. McCormick expressed the opinion that all the abrasions occurred at the same *259 time. He also stated that the injuries were consistent with the type of injuries that would be suffered by one scraping himself against the window ledge of the Knippers' bathroom window. Dr. McCormick further testified that it is highly unlikely that defendant was wearing pants when the abrasions occurred.
Dr. McCormick's autopsy revealed that the victim died of eight stab wounds that were inflicted in a random but repetitive fashion indicative of a "blitz attack" upon an idividual having no chance to defend herself. According to Dr. McCormick, the pattern of the kitchen knife found in the Knippers' yard was consistent with the type of wounds found on Sonja's body.

ASSIGNMENTS OF ERROR NO. 2, 3, and 4
Defendant complains that the selection of a single "death qualified" jury for both phases of his bifurcated trial deprived him of a jury drawn from a representative cross section of the community. In Assignment No. 2 the defendant contends that the exclusion of people who are unalterably opposed to capital punishment constitutes a systematic exclusion of an identifiable segment of the population from serving in capital cases. This argument has been specifically rejected by this court in State v. Ford, 489 So.2d 1250 (La.1986); State v. Ward, 483 So.2d 578 (La.1985); State v. Lowenfield, (La. No. 85-KA-0255, decided December 2, 1985); and State v. Jones, 474 So.2d 919 (La.1985).
In Assignment No. 3 the defendant argues that the use of "death qualified" juries results in the exclusion of a significant portion of the black population from the jury since a vast majority of blacks would never vote to impose the death penalty. While that may be true, the fact remains that it is those people who oppose capital punishment and not blacks per se who are being excluded from the jury. The exclusion is based upon attitude and not race. There are people of all races who oppose capital punishment. This court recently recognized that opposition to capital punishment is not restricted to any one particular segment of the population:
"An attitude such as this may spring from many sources: religious convictions, political affiliation, moral philosophy, an unwillingness to accept the responsibility for the death of a man, or the fear of an uneasy conscience. Further, an attitude, like opinions and beliefs, is subject to change with time and circumstances. This may occur in some people without reason. Therefore, a single attitude does not represent the kind of economic, social, religious, racial, political or geographic characteristics that underlies those groups that have been recognized as distinctive. People from all walks of life may and do hold this same belief." State v. Lowenfield, ___ So.2d at ___.
Finally, the defendant argues in Assignment No. 4 that the district court erred in prohibiting defense counsel from conducting a survey to determine the attitude of people towards the death penalty. In light of this court's disposition of Assignments No. 2 and 3, the defendant was not prejudiced by this denial.

ASSIGNMENT NO. 5
In this assignment the defendant argues that the Motion to Suppress his confession should have been granted since it was the product of an illegal arrest. This assignment lacks merit.
Federal and state constitutional protections against unreasonable searches and seizures exist only when an individual has a subjective expectation of privacy which society is prepared to recognize. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Lamartiniere, 362 So.2d 526 (La.1978). It is a well accepted principle that prisoners, by virtue of their incarceration, have decreased expectations of privacy. State v. McPhate, 393 So.2d 718 (La.1981); State v. Patrick, 381 So.2d 501 (La.1980); State v. Dauzat, 364 So.2d 1000 (La.1978).
*260 In State v. Patrick, 381 So.2d 501 (La. 1980), this Court was called upon to decide whether a work-release inmate, while out of prison during the day, has a reasonable expectation of privacy requiring a showing of probable cause before parish deputies can conduct a pat down search of the inmate. This Court unanimously concluded that such a person does not have such an expectation of privacy. In reaching that conclusion this Court stated that:
We find the limitation of defendant's expectations of privacy reasonable by prevailing, acceptable social standards, thereby satisfying the second aspect of the Katz inquiry. Society in general has a valid interest in limiting the expectations of privacy on the part of a person incarcerated in a detention facility for convicted criminals; including those inmates at conditional or qualified liberty on work-release programs intended for humane and rehabilitation purposes. (Emphasis added). State v. Patrick, 381 So.2d at 503.
Finding that the work-release inmate had no expectation of privacy, this Court denied Patrick's Motion to Suppress without requiring any showing of probable cause justifying the search.
Like the work-release inmate in Patrick, the defendant was enjoying a "conditional or qualified" liberty at the time that he was picked up for questioning. He was enjoying the privilege of a furlough which the Secretary of Corrections is authorized to grant under LSA-R.S. 15:833(B)(1). Just as an inmate who is granted the privilege of participating in a work release program, a person out on furlough remains in the constructive custody of the state. A prisoner's furlough is subject to cancellation at any time at the discretion of the proper authority. The only difference between the work-release participant in Patrick and a person on furlough such as the defendant is that the former was required to return to the prison every night while the latter may be allowed to remain out of the institution for a period of up to five days while in the custody of a family member or another authorized person. LSA-R.S. 15:833(B)(2). This difference does not give the latter any greater expectation of privacy than that possessed by the former. Therefore, applying the principle established in State v. Patrick, supra, we hold that the Motion to Suppress was properly denied.

ASSIGNMENT OF ERROR NO. 19
Defendant contends that the trial court erred in denying his Motion for New Trial since the evidence adduced at trial was insufficient to establish that Sonja Knippers was murdered during the course of either an aggravated burglary or an attempted aggravated rape. This assignment lacks merit.
The crime of aggravated burglary is defined by LSA-R.S. 14:60 as follows:
Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, (emphasis added) if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.
The defendant argues that the state failed to prove that he entered the Knippers' home "with the intent to commit a felony or any theft therein." Whether the defendant entered the residence with the requisite intent is a question of fact. The existence of specific intent may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Boyer, 406 So.2d 143 (La.1981); State v. McDermitt, 406 So.2d 195 (La.1981). In determining whether sufficient evidence exists in the record to support the jury's finding that the element of the crime was proven, we must construe the evidence in light most favorable to the state. Sufficient *261 evidence exists when a rational jury could find proof beyond a reasonable doubt that the element was proven. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Graham, supra; and State v. Straughter, 406 So.2d 221 (La.1981).
In this case the state did present sufficient evidence to convince a rational trier of fact that Dobie Gillis Williams entered the Knippers' home "with the intent to commit a ... felony therein." According to Dr. George McCormick, who examined the defendant approximately thirty hours after the murder, it was "highly unlikely" that the defendant was wearing pants when he skinned his legs during the escape through the bathroom window. The fact that the defendant was not wearing pants supports the conclusion that he entered the victim's home with the intent to commit a forcible sexual offense. Also, defendant's pubic hairs were found in the bathroom. See State v. Moore, 302 So.2d 284 (La.1974). All forcible sexual offenses are felonies.
The defendant also argues that the evidence was insufficient to support a finding that he was guilty of attempted aggravated rape. With this argument we also disagree. Rape is committed when an act of sexual intercourse takes place without the lawful consent of the victim. LSA-R.S. 14:42(A). Aggravated rape occurs when the victim resists the act of intercourse to the utmost and the resistance is overcome by force. LSA-R.S. 14:42(A)(1). An attempt is committed when the defendant, after having formed the intent to rape the victim, does an act for the purpose of and tending directly toward the accomplishing of his object. LSA-R.S. 14:27(A). While mere preparation to commit a crime shall not be sufficient to constitute an attempt, LSA-R.S. 14:27(B), the overt act need not be the ultimate step toward, or the last proximate act or the last possible act in the consummation of the crime attempted. State v. Thomas, 438 S.W.2d 441 (Mo. 1969). In determining whether the action of a defendant is mere preparation or an attempt, the totality of the facts and circumstances presented by each case must be evaluated. People v. Elmore, 50 Ill.2d 10, 276 N.E.2d 325 (1974).
The most reasonable conclusion to be drawn from the facts and circumstances of the case would support a finding that the defendant attempted to commit aggravated rape on the person of Sonja Knippers. However, that conclusion is entirely dependant on whether breaking and entering the victim's home and hiding behind the bathroom door with his pants off constitutes "an act for the purpose of and tending directly towards the accomplishing of his purpose," or whether it constitutes only "mere preparation" to commit the crime. We conclude that such acts were not "mere preparation," but tended directly toward the commission of the crime.
Admittedly, the distinction is one of degree and is dependent on the particular facts of each case.
Related to this issue is defendant's further claim that the evidence was insufficient to convict him of attempted aggravated rape. We disagree. The jury could have reasonably found that the defendant committed the crime of attempted aggravated rape from the following facts: (1) he broke and entered into the victim's home; (2) he removed his pants, the only conceivable purpose of which was to facilitate the unlawful sexual assault that he had planned for his victim; (3) he armed himself with a dangerous weapon which he intended to use to deprive the victim of her consent; (4) he closed and locked the bathroom door so as to enable him to commit the crime in relative security and to be closer to his avenue of escape after the crime was committed.

CAPITAL SENTENCE REVIEW
This Court reviews every death sentence to determine if it is excessive. La.C.Cr.P. art 905.9 and Louisiana Supreme Court Rule 28. In evaluating whether the death penalty is excessive in a particular case, the Court will evaluate the following:

*262 (a) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(b) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Supreme Court Rules 28, § 1.

Aggravating Circumstances
In its verdict the jury found the following statutory aggravating circumstances:
(a) The offender was engaged in the perpetration of aggravated burglary, or the attempted perpetration of aggravated rape.
(b) The offense was committed in an especially heinous, or atrocious, or cruel manner.
La.C.Cr.P. art. 905.6 mandates that the jury return a unanimous verdict on each aggravating circumstance which it concludes exists. In Assignment No. 18 the defendant argues that the inclusion of the word "or" in the jury's verdict finding the first aggravating circumstance indicates that the jury was unable to unanimously agree on either aggravated burglary or attempted aggravated rape, but was able to unanimously conclude that at least one of the two was committed. This assignment lacks merit. By including the word "or" in its finding of the first aggravating circumstance, the jury intended to find the defendant guilty of both crimes. See State v. Freeman, 444 So.2d 243 (La. App. 1st Cir.1983). As discussed in our disposition of Assignment No. 19, sufficient evidence was presented during the trial which would allow a rational finder of fact to conclude that the defendant was engaged in the perpetration of both aggravated burglary and attempted aggravated rape at the time that the murder was committed. The jury's verdict should not be overturned merely because it is arguably ambiguous and an inartful expression of its finding. State v. Cole, 158 La. 799, 104 So. 720 (1925).
The defendant argues in Assignment No. 22 that the trial court erred by failing to include in the jury instructions at the sentencing phase of the trial a definition of "especially cruel, heinous, or atrocious." We need not consider the merits of this argument since the evidence was clearly sufficient to support the finding of the first aggravating circumstance. A death sentence need not be vacated whenever the jury errs in only one of its findings of several statutory aggravating circumstances. State v. Wingo, 457 So.2d 1159 (La. 1984), cert. denied ___ U.S. ___, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Fuller, 454 So.2d 119 (La.1984); State v. Sonnier, 402 So.2d 650 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981). This is true as long as the evidence of the possibly unproven circumstance does not inject an arbitrary factor into the proceeding. State v. Rushing, 464 So.2d 268 (La.1985); State v. Wingo, supra; State v. Glass, 455 So.2d 659 (La.1984); State v. Sawyer, 422 So.2d 95 (La.1982). An arbitrary factor is introduced into the sentencing procedure when the court determines that the jury would probably not have returned the death penalty in the absence of evidence introduced solely for the purpose of proving the failed aggravating circumstance. State v. Wilson, 467 So.2d 503 (La.1985); State v. Rushing, supra. That did not occur in this case. All of the evidence tending to establish that the crime was committed in an "especially cruel, heinous, or atrocious" manner was properly considered during the guilt phase of trial. Such evidence consisted primarily of testimony and photographs establishing that the defendant was stabbed eight times and then bled to death. The nature of such evidence was merely proof of the crime itself.
Passion, Prejudice and Arbitrary Factors
In the following four assignments of error the defendant contends that arbitrary *263 factors were interjected into the proceedings.

ASSIGNMENTS OF ERROR NO. 15 AND 17
In these assignments the defendant contends that the district court erred by allowing into evidence at the sentencing phase of the trial proof of the defendant's prior conviction for attempted simple burglary. This Court has previously held that the state may introduce prior convictions in its case in chief in the penalty phase of a capital case. State v. Busby, 464 So.2d 262 (La.1985); State v. Jordan 440 So.2d 716 (La.1983).

ASSIGNMENT OF ERROR NO. 16
During the sentencing phase of the trial Larry W. Gene, the assistant warden of Camp Beauregard, testified that the murder of Sonja Knippers was committed while Dobie Gillis Williams was on a five day furlough from a penal institution. In this assignment the defendant argues that such evidence should not have been admitted into evidence. La.C.Cr.P. 905.2 states that "the sentencing hearing shall focus on... the character and propensities of the offender." The fact that Williams committed the murder while on furlough is relevant in evaluating his character. Hence, the testimony was properly admitted into evidence.

ASSIGNMENT OF ERROR NO. 24
During the defense counsel's closing argument in the sentencing phase of the trial he made the following statement:
"... You send him to the State Penitentiary at this point, he won't be able to get furlough. You heard the Warden, people convicted of First Degree Murder are not eligible for furloughs. He won't be able to get furlough. He will spend the rest of his life in our State Penitentiary."
On rebuttal the district attorney responded as follows:
"... Mr. Bonnette tells you the law, that you don't have to worry about anything in the future. I agree that there are no furloughs. The state of the law wasn't that about five years ago."
The defendant complains that the district attorney's remarks on rebuttal improperly raised the possibility that the law could be changed allowing someone serving a life sentence to be released on furlough. It is improper for a capital sentencing jury to consider the possibility that someone sentenced to life imprisonment may be released in the future. Therefore, that should not be discussed in the jury's presence. State v. Copeland, 419 So.2d 899 (La.1982); State v. Lindsey, 404 So.2d 466 (La.1981), cert denied. 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983).
However, the fact that the possibility of release is discussed in the jury's presence does not mandate that the case be remanded for resentencing. A case should be remanded only when the discussion presents a genuine risk that the jury's attention will be deflected from the ultimate significance and finality of the penalty recommendation or misguide the jury's sentencing discretion by the introduction of inappropriate considerations. State v. Sawyer, 422 So.2d 95 (La.1982). Therefore, when the prosecuting attorney argues extensively that the Governor may commute the sentence or pardon someone that has been sentenced to life imprisonment without considering the facts of the particular case, it is appropriate to remand the case for resentencing. State v. Willie, 410 So.2d 1019 (La.1982). Likewise, when the trial judge responds to a mid-deliberation question propounded by the jury asking for a definition of life imprisonment with an extensive discussion of the Governor's pardon and commutation power reversal of the sentence is appropriate. Lindsey, supra.
In this case the district attorney's challenged remark was made in response to a statement made by the defense that the defendant would not be eligible for furlough if sentenced to life imprisonment. It is the defendant who opened the door for the discussion of the topic by first referring to it in his closing argument. See *264 State v. Glass, 455 So.2d 659 (La.1984). Furthermore, the challenged statement was merely a brief responsive comment which implied that the Legislature could change the law making furlough available to someone who has been sentenced to life imprisonment. The district attorney did not dwell on the speculative possibility of such action See State v. Sawyer, supra. Taking into consideration these factors, we conclude that the challenged statement did not deflect the jury's attention from the proper considerations.

Proportionality
We must now consider whether or not the sentence is disproportionate to the penalty imposed, considering both the offense and the offender.

The Defendant
Dobie Gillis Williams was born in Kansas City, Missouri, on December 14, 1960. He is one of seven children born to Betty Williams. At the age of sixteen the defendant was expelled from Many High School for fighting. Since that time the defendant has spent most of his life in correctional institutions. On July 19, 1976, the defendant was committed as a juvenile to the Louisiana Training Institute (LTI) following an arrest for theft. He was released on January 2, 1977, and placed on probation. Four months later defendant was arrested for simple battery. He was returned to LTI where he remained until his release on March 3, 1978. On September 5, 1978, defendant was arrested for aggravated burglary, simple robbery, and armed robbery. His plea of guilty to those charges was subsequently reversed. Approximately fourteen months later Williams was arrested for attempted simple burglary. At the time of Sonja Knippers' murder, the defendant was on a five day furlough from Camp Beauregard where he was serving a four year sentence after being convicted of the latter crime.
The defendant has a "low-average I.Q." Phychiatric testing revealed no indication of schizophrenia or major affective disorder. However, the testing did reveal that the defendant has difficulty with authority figures and in controlling his temper.

The Crime
Sonja Knippers was a forty-four year old housewife who was stabbed to death in her own home. She enjoyed a good reputation in the community. The defendant did not know the victim.

Comparison with Similar Cases
Juries in the 35th Judicial District Court have not returned a death penalty since January 1, 1976. In fact, no one has ever been tried before in that court on charges of First Degree Murder. For that reason, it is appropriate in this case to look beyond the judicial district where the sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Lowenfield, supra; State v. Wingo, supra.
A state-wide review of death cases reveals that juries often find death sentences appropriate where an innocent victim was murdered inside the sanctuary of his or her own home. See State v. Wingo, supra; State v. Narcisse, 426 So.2d 118 (La.1983); State v. Watson, 449 So.2d 1321 (La.1984); State v. Summit, 454 So.2d 1100 (La.1984); State v. Glass, 455 So.2d 659 (La.1984); State v. Knighton, 436 So.2d 1141 (La. 1983); State v. Moore, 414 So.2d 340 (La. 1982). "The murder of a person by an intruder violating the sanctuary of the victim's own home is a particularly terrifying sort of crime to decent, law abiding people." State v. Wingo, 457 So.2d at 1170.
When compared to other capital sentences imposed throughout the state, the sentence of Dobie Gillis Williams is not disproportionate.

DECREE
For the above and foregoing reasons, the conviction and sentence of the defendant are affirmed.
AFFIRMED.
DENNIS, J., concurs with reasons.
LEMMON, J., concurs and assigns reasons.
*265 LEMMON, Justice, concurring.
I agree that a convicted criminal in the custody of the Department of Corrections has a greatly diminished expectation of privacy, depending on the circumstances surrounding the police conduct under review. The ultimate question, however, is whether the police conduct was reasonable in the particular case.
At the time that the defendant in this case refused to remove his pants and was told he would not be allowed to leave until he did so, the police knew (1) that a stabbing murder had been committed during a burglary by a black man who had escaped through a bathroom window; (2) that defendant was serving a prison sentence for a burglary conviction; (3) that defendant was home on furlough in the small town of Many; (4) that defendant lived within 2,000 feet of the victim's home; and (5) that defendant had a puncture wound between his thumb and forefinger and a fresh scratch on his upper left arm. Under these circumstances, the police conduct was reasonable, and there was no violation of defendant's constitutional rights.
NOTES
[1] Detectives McComic and Kinney testified differently concerning the precise moment the defendant armed himself. According to McComic's version defendant was armed prior to the victim's entry into the bathroom. According to Detective Kinney the defendant admitted picking up the knife after the victim started screaming.