# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-726

**STATE OF LOUISIANA**

**VERSUS**

**DAVID BILLY PARKER, JR.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 26188-14
HONORABLE GUY BRADBERRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## MARC T. AMY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, Van H. Kyzar, and Candyce G. Perret, Judges.

**AFFIRMED.**

**John F. DeRosier**
**District Attorney**
**Karen C. McLellan**
**Jacob L. Johnson**
**Cynthia Killingsworth**
**Assistant District Attorneys**
**Post Office Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Mary Constance Hanes**
**Post Office Box 4015**
**New Orleans, LA 70178-4015**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **David Billy Parker, Jr.**

**AMY, Judge.**

The State charged the defendant with one count of manufacture and possession of a bomb, and the jury ultimately found the defendant guilty of attempted manufacture and possession of a bomb. The trial court sentenced the defendant to seven years at hard labor, with credit for time served, and a fine of $5,000.00. The defendant appeals his conviction and sentence. For the following reasons, we affirm.

**Factual and Procedural Background**

After being dispatched to a residence to serve a warrant, Deputy Chris Miller, of the Calcasieu Parish Sheriff's Office, submitted, in pertinent part, the following narrative in an affidavit:

> During the execution of a felony warrant . . . [David Billy Parker, Jr.] was located in the attic. A search and seizure form was signed for the residence due to loose ammunition being seen while searching for the subject in the residence and the combination of the fact that the subject is a convicted felon. During the search of the residence, two pipe bombs were located in the attic w[h]ere the subject had been originally located.

Thereafter, by bill of information, the State charged the defendant, David Billy Parker, Jr., with one count of manufacture and possession of a bomb, a violation of La.R.S. 14:54.3. The defendant pled not guilty, and the matter proceeded to a jury trial.

At trial, Deputy Miller testified that, on September 28, 2014, he arrived at the defendant's residence to serve a warrant on the defendant. He stated that the defendant's wife told him that the defendant was not there but that she granted Deputy Miller permission to enter the residence to search for the defendant. Deputy Miller explained that he located the defendant in the attic; verbally commanded the defendant to come down from the attic; and, after the defendant

complied with the command and the defendant's wife signed a search and seizure form, searched the attic. Deputy Miller testified that, when "[he] entered the attic, [he] noticed two PVC pipes that were capped on both ends that had wires coming out of the ends[,]" which "looked like electrical wire." He stated that, upon seeing the devices, he removed himself, the defendant, the defendant's wife, and two children from the residence. Deputy Miller explained that he subsequently blocked off the residence and called for assistance because "through [his] training, [he] recognized it to be an IED [improvised explosive device] or a possible IED." Deputy Miller stated that the defendant told him that he had assembled the devices.

The jury also heard testimony from State Trooper Sean LaFleur, who explained that he is a technician supervisor for the Louisiana State Police, Emergency Services Unit, and that the unit he supervises is a "full-time HAZMAT and explosive response unit," which serves as "the bomb squad for the State Police." Trooper LaFleur testified that he and Investigator Hopkins were the bomb technicians that responded to Deputy Miller's call for assistance at the defendant's residence. According to his testimony, upon initially seeing the devices in the attic, Trooper LaFleur observed: "Two PVC pipes. They were capped on both ends. And on one end of each device, there was bare wire coming out. And on one device, the bare wire coming out had a coding that was red in color, and on the other device, it was - - I believe it was green in color."

Trooper LaFleur explained that the technique used to remove the devices from the residence is called a "hook and line kit[,]" which he described as a rope and pulley system that can be operated remotely for safety. He stated that during this process, one device came apart, specifically an endcap came off, and "then the pyrotechnic or firework charge that was inside the pipe actually came out from that

one device." Trooper LaFleur noted that, on the charge, he could see part of a label and believed the charge to be a consumer firework based on the label remnant, as well as the size. He classified they pyrotechnic charge as a "low explosive."[1] Trooper LaFleur testified that, after they removed the devices from the residence, they moved the devices with an extended pole to a sandbag area that had been set up to "disrupt them or render them safe."[2] At that point, Trooper LaFleur stated that they deployed a PAN (Percussion Activated Non-Electronic) disruptor, specifically "a disintegrating projectile . . . that is designed to . . . break that pipe apart without it letting the pipe detonate on us, and that's what happened in this case."

Regarding the devices, Trooper LaFleur testified that they fit the criteria he looks for in identifying a "pipe bomb." In this regard, the following colloquy occurred:

> Q. Okay. And what do you look for when you say the term "pipe bomb"? What do you look for when you're determining if that's what something is?
>
> A. Container. We look at the type of container. And pipe bombs can generally either be PVC or metal pipe bombs. We look to see whether or not they are capped on both ends and potentially if there are any other things coming out, wire, fuse, things of that nature. Commonly, people will use hobby or cannon fuse. Other times, they will use wire. Sometimes they are capped on both ends, and everything is internal. So when we see a pipe and see it capped on both ends, we treat it as an actual IED or pipe bomb until we can prove otherwise.

---

[1] Trooper LaFleur stated that low explosives are those that "generally travel at a detonation velocity less than 3300 feet per second." He also testified that "[l]ow explosives are things such as propellant, such as black powder, which can be used in hunting and other various things, different reenactments; smokeless powder, which goes in a handgun or a rifle; ammunition; or flash powder, which goes into fireworks."

[2] Trooper LaFleur explained the process of disruption as follows: "[W]hen we disrupt it, we take it apart and we open it up so we can gain access to what's inside without it - - try to do it without it detonating." He noted that disruption is safer than detonation.

Q. And did these devices fit those criteria?

A. That's correct.

Q. And how did they fit those criteria?

A. You had approximately a 10 to 12 inch long piece of PVC pipe capped on both ends, and you had bare wire coming out from one of the endcaps on each device.

Q. Going back to the one that came apart within the home, is it my understanding that there was a pyrotechnic charge within that pipe?

A. Yes.

Q. And electric wire was connected to that?

A. There was.

Trooper LaFleur further explained that detonating these devices "would be pretty simple" by using a flame or by short-circuiting a battery and heating the wire. He also noted that the devices could possibly detonate upon being dropped. Trooper LaFleur stated that, if these devices were intact and detonated, they would undergo fragmentation, which he described as "this thing coming apart in small pieces . . . up to about 3300 feet per second[.]" He testified that fragmentation can result in potentially serious injury and, in some cases, death. Trooper LaFleur concluded that he searched for the defendant's name in the explosive licensing database and found neither an active nor an inactive license with the defendant's name.

The jury returned the responsive verdict of attempted manufacture and possession of a bomb, a violation of La.R.S. 14:27 and 14:54.3. Thereafter, the defendant filed a motion for new trial, which the trial court denied. The trial court sentenced the defendant to seven years at hard labor, with credit for time served since September 2014, and a fine of $5,000.00. Subsequently, the defendant filed

4

a Motion for Reconsideration of Sentence and, at a hearing on the motion, argued that his sentence should be reduced to five years. The trial court denied the motion. The defendant now appeals, asserting the following assignments of error:

1. There is insufficient evidence to support David Billy Parker, Jr.'s conviction for attempted manufacture and possession of a bomb; the State failed to prove that the devices found in Mr. Parker's attic met the statutory definition of "bomb"; and

2. Mr. Parker's seven-year sentence and maximum fine of $5000 are excessive under the circumstances.

**Discussion**

*Errors Patent*

In accordance with La.Code Crim.P. art. 920(B), all appeals are reviewed for errors patent on the face of the record. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." *Id.*

After sentencing the defendant, the trial court stated: "Mr. Parker has two years to file what's called 'post-conviction relief[.]'" Louisiana Code of Criminal Procedure Article 930.8 provides that the defendant has two years *after the conviction and sentence become final* to file an application for post-conviction relief. Accordingly, we find that the trial court's advisement regarding the time limitation for filing an application for post-conviction relief was insufficient. *See State v. Conway*, 12-525 (La.App. 3 Cir. 11/7/12), 101 So.3d 1132. We instruct the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice. *See id.*

5

*Sufficiency of the evidence*

In his first assignment of error, the defendant asserts that there is insufficient evidence to support his conviction for attempted manufacture and possession of a bomb and that the State failed to prove that the devices found in his attic meet the statutory definition of "bomb" found in La.R.S. 14:54.3(B). In discussing the issue of sufficiency of the evidence, this court has explained:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Duncan*, 420 So.2d 1105 (La.1982). It is the role of the fact finder to weigh the respective credibilities of the witnesses. The appellate court should not second guess the credibility determinations of the trier of fact beyond the application of the sufficiency evaluations allowed under the *Jackson* standard of review. See *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983).

*State v. Tassin*, 472 So.2d 340, 342 (La.App. 3 Cir.), *writ denied*, 477 So.2d 97 (La.1985). Thus, in order for an appellate court to affirm a conviction when the issue of sufficiency of the evidence has been raised, "the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt." *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. With this standard of review in mind, we turn to the elements of the crime at issue herein.

The defendant was convicted of attempted manufacture and possession of a bomb. Louisiana Revised Statutes 14:54.3 is titled "Manufacture and possession of a bomb" and provides, in pertinent part:

> A. It shall be unlawful for any person without proper license as required by R.S. 40:1472.1 et seq., knowingly and intentionally to manufacture, possess, or have under his control any bomb.

. . . .

> D. This Section shall not apply to fireworks possessed within the meaning and contemplation of R.S. 51:650 et seq.

An "attempt" to commit a crime is defined in La.R.S. 14:27(A), which provides:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

However, "[m]ere preparation to commit a crime shall not be sufficient to constitute an attempt[.]" La.R.S. 14:27(B)(1).

In briefing to this court, the defendant alleges that "the most significant fact is that the devices had no detonator or 'initiator,' so they did not meet the statutory definition of a bomb." He contends that the evidence is insufficient because "[a]lthough [Trooper LaFleur] explained what might initiate the device, *i.e.*, a flame or battery, there was no evidence of a battery or any explanation how one might employ a flame to explode the devices." However, we note that, while La.R.S. 14:54.3(B) defines a bomb "as an explosive compound or mixture with a detonator or initiator, or both," it further states that: "The term 'bomb', as used herein, shall also include any of the materials listed in Subsection C present in an unassembled state but which could, when assembled, be ignited in the same manner as described in Subsection C, when possessed with intent to manufacture or assemble a bomb." In pertinent part, La.R.S. 14:54.3(C) provides:

> As used herein the term "explosive" means . . . any . . . device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

With this in mind, we consider the testimony adduced at trial about the devices.

7

In this regard, and as discussed above, Trooper LaFleur testified that the devices found in the defendant's attic fit the criteria that he looks for when determining if something constitutes a "pipe bomb" because the devices were composed of PVC pipe capped on both ends and containing electrical wire connected to a pyrotechnic charge, which he classified as a low explosive. Further, the following information was elicited during Trooper LaFleur's testimony:

Q. Given that these devices had that electrical wiring coming out of them, how difficult would it be to have this item detonate?

A. It would be pretty simple. In fact, actually, low explosives don't require typical detonator or blasting cap or initiator to initiate them. To initiate these things, it just needs flame. Or in some cases, you can take this bare wire and hook a battery up to it with just a little bit, heat this wire up, and you can function this device.

So if I short-circuited a battery onto the end of this device and heat that wire up enough, that would be enough to initiate this device.

. . . .

[A.] In this case, we're dealing with pipe bombs.

. . . .

But when you take a low explosive and you containerize it such as putting it inside a pipe, whether it is PVC or metal, you end up with what's called a mechanical explosion. And what happens is there is nowhere for the gases to go that are burning, so what happens is it ends up over pressuring this device. And that's where you get that fragmentation and this thing coming apart violently. So that's what you get.

Pipe bombs are by definition a mechanical explosion because what you are doing is you're just confining those gases until they get [to] a point to where that container just can't hold it.

. . . .

> Q.  And you said it would not detonate without some sort of initiator?  Like a firework is not just going to detonate if you drop it on the ground, correct?
>
> A.  It potentially can because fireworks just like different types of explosives are sensitive to heat shock and friction.

Importantly, Trooper LaFleur testified that adding fire, a battery, or friction could initiate the subject materials and result in an explosion.

In his assertion that the State failed to prove that the devices in question constituted bombs, the defendant further notes that La.R.S. 14:54.3 does not apply to the possession of fireworks.  He argues that "[t]he evidence shows that the devices in question were created simply as a modification of ordinary fireworks—not to enhance their capability to do damage."  In support of his argument, the defendant also points out that "Trooper LaFleur confirmed that no nuts, bolts, nails, or anything of that nature was found inside the PVC pipe."

Regarding how the fireworks had been modified, Trooper LaFleur stated that the firework fuse was removed and replaced with a wire and that "[i]t would be pretty simple" to initiate the device with a flame or battery due to the presence of the wire.  Trooper LaFleur also explained that the fireworks had been modified because "legal fireworks don't come in a container such as PVC with endcaps on it either."  On this point, he explained:  "The danger is the fact that the firework was in an enclosed container.  And had that thing come apart as other pipe bombs do, then the hazard is the container itself, not the firework."  While acknowledging that the devices did not contain "shrapnel," Trooper LaFleur explained:

> [A.]  Now, if these devices are intact and they detonate, these things come apart.  End caps will come off, and these devices will fragment.  You'll hear the term shrapnel or fragmentation from time to time, two completely different things but things that sometimes are mischaracterized.

> Fragmentation is this thing coming apart in small pieces. And as fast as that material is, up to about 3300 feet per second, this pipe or fragments of this pipe can travel at that same velocity.
>
> Shrapnel is a different term, something we didn't see here, but you will hear the term, and those are things added to it. Some devices we deal with have nuts and bolts, ball bearings, BBs, things of that nature, which are intended to cause harm and things like that.
>
> But this thing, if it detonates even without those things, it's going to fragment. You can kind of see it a little bit here (indicating). It will come off in very small pieces . . .
>
> . . . .
>
> A.     There would be expectation there would be some sort of injury, potentially serious injury. And in some cases, some of these devices could involve or include death as well.

Notably, Trooper LaFleur explained that the modifications to the fireworks, namely the wires and the capped containers, meant that the devices were simple to initiate and that initiation would result in fragmentation, which can cause serious injury or death. Considering the foregoing testimony, and viewing the evidence in the light most favorable to the prosecution under the *Jackson* standard of review, we maintain the defendant's conviction.

Significantly, and notwithstanding the defendant's argument regarding whether the devices included a detonator or initiator, the defendant was convicted of *attempted* manufacture and possession of a bomb. Louisiana Revised Statutes 14:27 states that an "attempt" occurs when "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object[.]" Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or

10

failure to act." La.R.S. 14:10(1). In discussing criminal attempt, the supreme court has stated:

> Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. [*State v.*] *Ordodi*, [06-0207 (La. 11/29/06), 946 So.2d 654,] 661; *State v. Weary*, 03-3067 (La.4/24/06), 931 So.2d 297, 310, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006). The determination of whether specific intent exists is a fact question for the jury. *Ordodi, supra* at 661; *State v. Legrand*, 02-1462 (La.12/3/03), 864 So.2d 89, 96, *cert. denied*, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005).
>
> . . . .
>
> The State must also prove defendant committed or omitted " 'an act for the purpose of and tending directly toward the accomplishing of his object,' sometimes referred to as an 'overt act.' " *Ordodi, supra* at 661. In *Ordodi*, we explained that the attempt statute makes a distinction between actions which are "mere preparation" and are not sufficient to constitute attempt, and acts which are committed for the purpose of and tending directly toward the accomplishing of the criminal object. *Id.* at 662. However, we noted that the distinction is not clearly defined and that actions which are mere preparation and those which constitute an overt act "exist on a continuum." *Id.* Where a defendant's actions fall on the continuum is a fact question for the trier of fact and is determined by evaluating the "the totality of the facts and circumstances presented by each case." *Id.* (Citing *State v. Smith*, 94-3116 (La.10/16/95), 661 So.2d 442, 444; *State v. Williams*, 490 So.2d 255, 261 (La.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987)). The overt act need not be the ultimate step toward or the last possible act in the consummation of the crime attempted, and it is the intent to commit the crime, not the possibility of success, that determines whether the act or omission constitutes the crime of attempt. *Smith, supra* at 445.

*State v. Jones*, 10-0762, pp. 6-7 (La. 9/7/11), 74 So.3d 197, 201-02.

As discussed above, Deputy Miller testified that he discovered the devices in the attic where the defendant had been located and that the defendant told him that he had assembled the devices. Additionally, Trooper LaFleur explained that consumer fireworks had been modified in creating these devices:

[Q]. Have you ever come across any type of residential firework that comes in a plastic - - or in a PVC pipe with caps on both ends?

11

A. No.

. . . .

Q. Have you ever come across a firework that comes with electric wiring from the store?

A. No.

. . . .

Q. So this would have been something that - - after market done, correct, by an individual?

A. Yes. You can't buy it like that.

Q. You can't buy it that way? Was this altered in any way from when it was a firework bought at the store?

A. Yes.

Q. How is that?

A. The fuse was removed.

Q. What was in its place?

A. In this picture, nothing. But previously and consistent with the other IED, there was bare wire or there was wire running into it.

Trooper LaFleur explained that these modifications, namely the replacement of the firework fuse with wire and the placing of the firework into capped PVC pipe, meant that "[i]t would be pretty simple" to detonate the devices and that detonation would result in fragmentation. Trooper LaFleur stated that he "did a name search under our explosive licensing database" for the defendant's name and that the search results showed that there was "[n]o active or inactive license with [the defendant's] name." La.R.S. 14:54.3(A); La.R.S. 40:1472.1 *et seq.* *See also* *Tassin*, 472 So.2d 340.

Considering the foregoing, and viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have

found that the State proved beyond a reasonable doubt that the defendant had specific intent and committed an overt act in furtherance of the crime of manufacture and possession of a bomb. Thus, we affirm the defendant's conviction for attempted manufacture and possession of a bomb.

*Excessive sentence and excessive fine*

In his second assignment of error, the defendant contends that his "seven-year sentence and maximum fine of $5000 are excessive under the circumstances." In particular, the defendant asserts that his sentence is excessive in light of *Tassin*, 472 So.2d 340 (wherein the defendant, who pled guilty to being a habitual offender, third offense, was convicted of manufacture and possession of a bomb and sentenced to ten years at hard labor).[3]

The penalty for "Manufacture and possession of a bomb" is found in La.R.S. 14:54.3(E), which provides: "Whoever violates this Section shall be fined not more than ten thousand dollars or be imprisoned at hard labor for not more than twenty years, or both." However, the defendant was convicted of attempted manufacture and possession of a bomb, and La.R.S. 14:27(D)(3) provides that the penalty for an attempt "shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both." Therefore, the defendant was subject to a maximum term of imprisonment of ten years and a maximum fine of five thousand dollars. As discussed above, the defendant received a sentence of seven years at hard labor and the maximum fine.

Regarding appellate review of an excessive sentence claim, a panel of this court stated:

---

[3] In *Tassin*, 472 So.2d at 342, the opinion reports only that "the defendant . . . was sentenced to serve ten years at hard labor in the Department of Corrections." It does not indicate whether the defendant received a fine.

Both the United States and Louisiana constitutions guarantee that no person shall be subject to cruel and unusual punishment. U.S. Const. amend. VIII; La. Const. art. I, § 20. A sentence is excessive when a reviewing court finds that the penalty is "so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering." *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331. The trial court has broad sentencing discretion, and a sentence within statutory limits will not be set aside absent a manifest abuse of that discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124, *writ denied*, 00-165 (La.6/30/00), 765 So.2d 1067. However, sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979).

In reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La.6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-772, pp. 3-4 (La.App. 3 Cir. 2/12/14), 153 So.3d 1008, 1011, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

At the sentencing hearing, the trial court and counsel for the State discussed that the defendant was eligible to be charged as a habitual offender, which could have increased his penalty. Counsel for the State also reminded the trial court that the defendant had pending charges, specifically two counts of carnal knowledge of

a juvenile, as well as a criminal history, which included two felony convictions. In light of the foregoing, we find no manifest abuse of the trial court's broad sentencing discretion. Accordingly, we affirm the defendant's sentence.

## DECREE

For the foregoing reasons, the conviction of the defendant, David Billy Parker, Jr., for attempted manufacture and possession of a bomb is affirmed. Additionally, the defendant's sentence of imprisonment of seven years and the $5,000.00 fine are affirmed. The trial court is instructed to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

**AFFIRMED.**